366 So.2d 1223 (1979)
Deborah LACHS, Appellant,
v.
STATE of Florida, Appellee.
No. 77-2362.
District Court of Appeal of Florida, Fourth District.
January 31, 1979.
*1224 Richard L. Jorandby, Public Defender, West Palm Beach, and Martin H. Colin, Lake Worth, for appellant.
Robert L. Shevin, Atty. Gen., Tallahassee, and Benedict P. Kuehne, Asst. Atty. Gen., West Palm Beach, for appellee.
LETTS, Judge.
This appeal is from the trial court's denial of a motion to suppress evidence obtained as a result of a stop and frisk. We affirm.
The facts reveal a radioed BOLO transmitted to two police officers on routine patrol at 8:00 o'clock Friday evening. The report directed the officers to proceed to the Big Savoy Bar because its manager had called to report "a black male subject, dressed in a blue denim outfit with a hat and a white female subject [the appellant] *1225 in his company ... dealing in narcotics in the bar and ... at this time, standing outside the bar smoking a marijuana cigarette." The officers were well acquainted with the bar in question, it being located in a high crime, drug infested area described as "one hundred percent black." They responded and on arrival at the bar, immediately espied, outside the front door, the female appellant and her black companion exactly as described in the radio dispatch. The officers could see neither drug dealing nor pot smoking on arrival, however the two conversing suspects immediately separated and walked hastily in opposite directions, as soon as they saw the police arrive. Thereupon, without resort to the bar manager, one of the officers stopped the quickly departing appellant and asked her for identification. When she opened her pocketbook to provide same, the officer then made a plain view seizure of a supposed "nickel bag" which he preliminarily determined to be marijuana after inspecting its contents. He thereupon placed the appellant under arrest.
We have repeatedly written on Florida's "stop and frisk" law, Section 901.151, Florida Statutes (1977) and would normally see no reason for yet another opinion. However, the claim is made here that this stop was predicated upon an anonymous BOLO on which the police were not entitled to place reliance. This variation merits discussion and provides a springboard for a recapitulation of the existing stop and frisk law as we view it.
In a very recent case, we reiterated that "in order for a BOLO to justify a stop there must be some showing ... that the information contained in the BOLO [is] reliable. If the police receive the BOLO information from some unknown tipster, it [does] not carry the credibility necessary to justify reliance thereon... . The state ... must adduce proof to support the reliability of the information contained in the BOLO... ." Barry St. John v. State, 363 So.2d 862 (Fla. 4th DCA, Opinion filed November 1, 1978.)
We are of the opinion that the state adduced such proof in the case now before us. This was not an anonymous tip from a unknown tipster, it was a telephoned complaint from an identified citizen who gave his occupation and address, the latter well-known to the police. See State v. Harrington, 307 So.2d 466 (Fla. 2d DCA 1975). It is true that the officers were not supplied with the actual given name of the complaining bar manager. Nonetheless he was fully identified by occupation and address and we are of the opinion that this was sufficient. In such situations complaints by fully identified law abiding citizens are entitled to as much credibility as those of paid informers or the victims themselves. State v. Harrington, supra. An actual eyewitness to a crime is as capable of reporting it, as is the victim. See Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Thus, for example, a BOLO declaring that one, John Q. Citizen, has just witnessed a stabbing at a particular address, accompanied by an accurate description of the assailant who is thereupon seen walking away from the scene by arriving police, is sufficient to justify a stop of that alleged assailant. To require the police to first carefully examine the reporting witness to determine whether the latter knows a stabbing when he sees one, would probably result in the escape of the assailant which consequence is directly opposite to the very purpose of the stop and frisk statute. Said statute authorizes a stop whenever circumstances "reasonably indicate that ... a person has committed, is committing or is about to commit a violation...." As Justice Alderman said in State v. Stevens, 354 So.2d 1244, 1247 (Fla. 4th DCA 1978):
To justify temporary detention, only "founded suspicion" in the mind of the detaining officer is required. Lewis v. State, 337 So.2d 1031 (Fla. 2d DCA 1976); State v. Othen, 300 So.2d 732 (Fla. 2d DCA 1974); State v. Ebert, 251 So.2d 38 (Fla. 2d DCA 1971). A "founded suspicion" is a suspicion which has some factual foundation in the circumstances observed by the officer, when those circumstances *1226 are interpreted in the light of the officer's knowledge. "Mere" or "bare" suspicion, on the other hand, cannot support detention. Coleman v. State, 333 So.2d 503 (Fla. 4th DCA 1976). Mere suspicion is no better than random selection, sheer guesswork, or hunch, and has no objective justification.
See Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and Thomas v. State, 250 So.2d 15 (Fla. 1st DCA 1971). There will be borderline cases, of course, in which reasonable men might differ as to whether the circumstances witnessed by an officer gave an objective foundation to his suspicion. Certain factors might then be evaluated to determine whether they reasonably suggested the suspect's possible commission, existing or imminent, of a crime: The time; the day of the week; the location; the physical appearance of the suspect; the behavior of the suspect; the appearance and manner of operation of any vehicle involved; anything incongruous or unusual in the situation as interpreted in the light of the officer's knowledge.
Assuming that reasonable men might differ in the case at bar, we apply the above quoted Stevens criteria and find the following:
1. As to time: A report of a crime in progress, at the very moment the BOLO, was received. No inordinate passage of time occurred between the BOLO and the stop. (This time factor can also be applied to the hour of the day, as it was in Stevens (late Sunday night). In the instant case, 8:00 P.M. on a Friday night, in a bar was of no significance.)
2. As to day of week: This is irrelevant in the case at bar, however, in Justice Alderman's decision it was relevant, in that a city supply yard is highly unlikely to be conducting business late on a Sunday evening.
3. As to location: The exact address at which the crime was being committed was given to the police.
4. As to physical appearance of the suspects: A comprehensive description of her companion was given and appellant was still in his company at the precise location.
5. As to behavior: The unexplained hasty departure in opposite directions as soon as the police cruiser appeared.
6. As to appearance and operation of an involved motor vehicle: This is inapplicable here.
7. As to incongruity: There was testimony that the presence of a white female at this all black bar was unusual. We are not so foolish as to believe, or suggest, that the presence of one caucasian in a so-called all black bar, constitutes a founded suspicion of a crime being committed. The era has thankfully gone when one could be "reasonably" presumed to have committed a crime because of skin color. Nonetheless, like it or not, it would ignore reality to suggest in the case before us, that the appellant's presence would not come under Justice Alderman's definition of something "incongruous or unusual in the situation as interpreted in the light of the officer's knowledge" and all the other surrounding facts.
8. As to reliability of the BOLO: The report was received from an identified eyewitness to the crime describing the infraction and giving a precise address.
No doubt, no one of the above, particularly the seventh, would in and of itself give rise to a founded suspicion. Nor do we suggest that the numbered list is exclusive or that the presence of all of these factors is required. Nevertheless, in the case now before us, we are of the opinion that there was much more than a "bare suspicion" as defined by Judge Moore in Delp v. State, 364 So.2d 542 (Fla. 4th DCA 1978). Rather we are convinced that in "the light of the officer's knowledge" (Stevens, supra, 1247) and under the totality of the circumstances, there was a founded suspicion to justify a stop.
For comparison, we refer to another recent case in which this author and Judge Beranek came to a contrary result. See Hall v. State, 366 So.2d 865 (Fla. 4th DCA 1979). In this latter situation, the police *1227 BOLO reported that the owner of a clothing store called to complain of "suspicious behavior" by blacks at his store. Responding thereto, the officers observed two blacks leave the store and drive off, all in a perfectly normal manner and the officers hurriedly enquired of the owner about the nature of the suspicious behavior. The answer was not that the suspects had been seen shoplifting or engaging in any other action suggestive of such activity. Instead, the suspicions had been aroused merely because the same blacks had already visited the store twice before that day and had bought nothing. Based on this information the stop was made. We are of the opinion that there is a world of difference in the two cases. In Hall, supra, the incident occurred during normal business hours and there was no actual report of a crime. The report was no more than a "bare suspicion" on the part of the alleged victim never mind the police. Such being so, the officers should have investigated further before making a stop because we cannot suppose a "founded suspicion" predicated on two prior visits by blacks to a store open for business during which no purchases were made. This epitomizes the abhorrence to which we earlier referred, that is, a suggestion that merely because black people[1] returned to the store and did not buy any clothes that this constituted a "founded suspicion" that a crime was being, or was about to be, committed. Clearly this is unacceptable. Also see Mullins v. State, 366 So.2d 1162 (Fla. 1978) in which the Supreme Court struck down a stop because it was made solely on the basis of riding a bicycle slowly through a residential area in the very early morning hours. This Mullins case is also interesting in the light of Justice Alderman's concurrence, on the question of plain view seizure based on a stop because the officer wishes to render assistance rather than investigate suspicious behavior.
Progressing to the next point on appeal we also hold that, subsequent to the initial stop, the officer had probable cause to make the arrest. Some of his testimony in this regard was as follows:
Q Now, your partner, which direction did he go?
A Towards the black male subject.
Q Which direction did you go?
A Towards the female.
Q So they went in opposite directions, one from the other?
A Yes.
Q When you went to the female what if anything, did you do?
A I requested her to produce some identification.
Q Did she produce some identification?
A Yes, sir, she did.
Q How did she do this?
A By opening her pocketbook.
Q What if anything, did she produce?
A As she was reaching into her pocket-book, I observed a manila colored envelope.
MR. JORDAN: Your Honor, that is not responsive to the question. The question is: What did she produce?
THE WITNESS: At that time, nothing.
Q What if anything, did you see?
A A small manila colored envelope approximately two by four inches, folded over and secured with a piece of tape.
Q How long have you been a police officer all together?
A Approximately five years.
Q Two years for the Fort Lauderdale P.D.?
A Yes.
Q Three years for whom?
A Middletown Police Department in Levittown, Pennsylvania.
Q During the course of your five years as a police officer, have you had an opportunity to observe people that were dealing with narcotics or drugs, or the possession of same?
A Yes, sir.
Q On how many different occasions in the course of five years would you say you made an arrest for drugs?

*1228 A About three or four hundred.
Q Have you testified in Court concerning those arrests?
A Yes, sir, I have.
Q How often have you testified in Court concerning drugs?
A Two hundred.
Q Either in the way of a motion as we are here on today, or in the way of trials, is that correct?
A Yes, sir.
Q Have you ever worked in the area where you went to that particular evening?
A Yes, sir, I have.
Q Within the past, say, six months prior to May 13th of this year, how many arrests would you have made involving drugs right within this immediate neighborhood?
A Maybe seventy-five.
Q In your experience as a police officer, based upon the five years experience you have, would you describe this area as a high drug use area?
MR. JORDAN: Judge, I object to that categorization.
THE COURT: I think it is not a categorization. Overruled.
Q You can answer the question.
Based upon your experience in five years as a police officer, is this neighborhood considered a high drug use area?
A Very definitely.
Q Would you say that bar in that vicinity would be a high drug use area?
A Very definitely.
Q During the course of your five years as a police officer, did you have an opportunity to see what is commonly referred to or said on the street as nickel bags?
A Yes, sir.
MR. JORDAN: I object to the use of the words nickel bags. I think he is going outside the motion. In my motion, I never referred to that name.
THE COURT: Well, go ahead.
Q (By Mr. Harris) Describe for us what you know to be a nickel bag.
A Yes, sir. A manila colored envelope, approximately two by four inches. When it contains a substance marijuana, it is known as a nickel bag and is normally folded over on the top and secured with a piece of tape.
In response to the foregoing, the appellant cites us to cases holding that just because some suitable container is seen in plain view, that fact cannot give probable cause to suppose the presence of contraband in it. See Bailey v. State, 295 So.2d 133 (Fla. 4th DCA 1974) and Carr v. State, 353 So.2d 958 (Fla. 2d DCA 1978).[2] However we would distinguish these cases in that in Bailey, the court did not appear to base its rejection of the search on the theory of the "cosmetic bag" container. As to the Carr case there were no attendant circumstances other than two unevenly rolled and twisted cigarettes. In the case at bar, other attendant circumstances are abundant.
Like the trial judge, we take note of the vast experience of the police officer in the case now before us and his utter familiarity with "nickel bags." True, not all small, folded, taped manila envelopes contain marijuana. Nevertheless under the totality of the circumstances, commencing with the BOLO and escalating therefrom, the officer had probable cause to believe the envelope contained cannabis and we agree with the reasoning of Skelton v. State, 349 So.2d 193 (Fla. 3d DCA 1977) wherein the court said:
In the instant case Officer Cantillo, the arresting officer, was highly experienced and often involved in drug related arrests. He was well acquainted with the neighborhood in which the arrest took place. He testified that on the date in question he observed a young man walk up to the defendant, who was standing on the corner of West Flagler Street and Seventh Avenue, and hand him (the defendant) a stack of small brown packets, each packet being 2" by 3" in size. The defendant placed the packets, secured by *1229 rubber bands, into his jacket pocket. Officer Cantillo exited from his patrol car, retrieved the packets from the defendant's pocket and placed him under arrest. Cantillo further testified that cannabis is often distributed in packets similar to those he had taken from the defendant and he believed a drug sale was in progress.
Under the totality of the circumstances, Officer Cantillo had probable cause to believe that the packets contained cannabis (marijuana) and a narcotics sale was in progress. Thus, the trial judge was correct in denying the motion to suppress.
AFFIRMED.
DOWNEY, C.J., and BERANEK, J., concur.
NOTES
[1] The record reflects that the officer testified: "there isn't too many black males in the area.
[2] But out of the same court, see State v. Redding, 362 So.2d 170 (Fla.2d DCA 1978).