491 So.2d 1164 (1986)
Frank McCLOUD, Appellant,
v.
STATE of Florida, Appellee.
No. 85-1175.
District Court of Appeal of Florida, Second District.
June 13, 1986.
Rehearing Denied July 28, 1986.
*1165 James Marion Moorman, Public Defender, and Ann N. Radabaugh, Asst. Public Defender, Bartow, for appellant.
Jim Smith, Atty. Gen., Tallahassee, and Charles Corces, Jr., Asst. Atty. Gen., Tampa, for appellee.
SANDERLIN, Judge.
In a two-count information, appellant was charged with: (1) carrying a concealed firearm and (2) possession of less than twenty grams of cannabis. Appellant's motion to suppress the firearm and cannabis was heard and denied. He then pled nolo contendere to the charges and reserved his right to appeal the denial of his motion to suppress. At plea proceedings, the trial court adhered to the guidelines and sentenced appellant to five years' probation.
In this appeal appellant properly challenges the investigative stop which led to the discovery of the firearm and the cannabis. For reasons set out below, we hold that the firearm and the cannabis were the fruit of an illegal stop. Therefore, we reverse the trial court's order denying appellant's motion to suppress and remand with directions to vacate his conviction.

THE STOP
On November 21, 1984, at approximately 1:20 a.m., Sergeant Byrus and Deputy O'Mara, of the Lee County Sheriff's Department, were patrolling the Dunbar section of Lee County; in particular, the southeast corner of Henderson and Anderson. The officers testified that this was a "high-crime area;" however, they were not responding to a specific complaint.
While in the area, Byrus and O'Mara observed a car backed up to a boarded-up building on the east side of Henderson Street. Posted on the building, directly above the car and in plain view, were signs warning, "No Trespassing" and "No Loitering." With O'Mara behind the wheel, the cruiser pulled into a parking lot adjacent to the building. The officers exited the cruiser. O'Mara walked towards the suspect vehicle and Byrus walked towards the building to survey for evidence of entry. As O'Mara came upon the suspect vehicle, appellant started the engine and put it in gear. Before the car could advance, O'Mara stepped in its path, told appellant to stop and ordered him to turn the engine off. The appellant complied. In the meantime, Byrus' survey of the boarded-up building had revealed no evidence of entry. He concluded his survey by positioning himself behind the vehicle. O'Mara was positioned at the driver's side window, preparing to speak to the appellant.
According to O'Mara's and Byrus' testimony, the appellant made no furtive movements, did not try to conceal anything, and had no weapon in his hands. He merely stopped, turned off the engine, remained in the car, and awaited the officers' next direction.

THE INTERROGATION, THE SEARCH, AND THE SEIZURE
While standing at the driver's side window, O'Mara asked the appellant, "What are you doing here?" and "Do you have some identification?" Appellant produced his license without resistance and replied he was "waiting for someone." During this colloquy, O'Mara was shining his flashlight throughout the interior of the car.
Having completed his survey of the building, Byrus began his approach from the rear of the car. He could not hear O'Mara's words with the appellant and this point, the officers' testimony conflicts. O'Mara testified that Byrus walked from the rear of the car to the passenger side door. Byrus testified that he walked from the rear of the car along the driver's side to where O'Mara was standing. At any rate, as Byrus was approaching, he shined his flashlight in the car and observed "a plastic handle appear[ing] to be from a gun, under the driver's seat." The firearm was "[d]irectly underneath [the appellant] on the drivers' side under the seat." Byrus alerted O'Mara to the firearm under the seat. Once again, O'Mara shined his flashlight throughout the car, but told Byrus he could not see a firearm. Immediately, they *1166 told the appellant to step out of the car and O'Mara, finally seeing the weapon, retrieved it and placed the appellant under arrest. Later, a search at the jail revealed less than 20 grams of cannabis in appellant's shirt pocket. He was charged with possession of a concealed firearm and possession of less than 20 grams of cannabis.
There is a discrepancy as to how much time elapsed between the initial stop and the discovery of the firearm. O'Mara testified that, after the stop, his conversation with the appellant took "a matter of seconds or a minute." Byrus testified that, after the stop, he checked out the building for possible burglary and then positioned himself at the rear of the car. After a "few minutes," he approached the driver's side of the appellant's vehicle.

CONSTITUTIONAL PROTECTIONS
According to our federal and state constitutions, the people have the right to be secure against "unreasonable searches and seizures." U.S. Const. Amend. IV; Art. I, sec. 12, Fla. Const. Though originally conceived as applicable to the home and hearth, these protections apply with equal force to situations involving occupied automobiles. Accordingly, "whenever a police officer accosts an individual and restrains his freedom ... he has `seized' that person." Terry v. Ohio, 392 U.S. 1, 16; 88 S.Ct. 1868, 1877; 20 L.Ed.2d 889, 904 (1968) (emphasis supplied). Following this rationale, the Florida Supreme Court has recently held:
Unquestionably, stopping an automobile and detaining its occupant constitutes a seizure within the meaning of the fourth amendment to the United States Constitution.
State v. Jones, 483 So.2d 433, 435 (Fla. 1986).
Since Terry, this court has enunciated various criteria as necessary for a constitutionally valid, investigatory stop of an automobile. The stop of the vehicle "must be predicated on a founded or reasonable suspicion which requires further investigation to determine whether its occupants have committed, are committing, or are about to commit a crime." Lower v. State, 348 So.2d 410, 411 (Fla.2d DCA 1977). See also sec. 901.151, Fla. Stat. (1975) ("stop and frisk") and Terry. Later decisions of this court have framed the issue as, "whether the deputy had a well-founded suspicion that [the suspect] had been engaged in criminal activity." State v. Lewis, 406 So.2d 79 (Fla. 2d DCA 1981). Lewis also instructs us that, "for purposes of deciding whether there is sufficient evidence to support a well-founded suspicion, a court should consider all of the facts known to an officer up until the time he makes the stop." Id. at 80. Having addressed the applicable law, we now apply it to the facts at hand.
Under Lewis, O'Mara and Byrus were required to consider all facts known to them and relevant to the appellant up until the point O'Mara extended his arm, directing the appellant to turn off his car. At that point the appellant came under an "investigatory stop." See Terry. Any activity or sensory impression occurring after the "stop" cannot be considered in our "well-founded suspicion" analysis.
At the time of the stop, O'Mara and Sergeant Byrus were aware of the following facts:
1) it was approximately 1:20 a.m.;
2) they were in a "high crime area";
3) they were not responding to a specific complaint;
4) the building adjacent to appellant's car was boarded up;
5) signs on the adjacent building read, "No Trespassing" and "No loitering";
6) appellant was alone in his car with the engine off;
7) as O'Mara approached, appellant started his car, put it in gear, and attempted to go on his way;
8) when O'Mara gave a hand signal to "stop," appellant made no furtive movements, did not attempt to conceal anything, and had no weapon in his hands.
*1167 When viewed in the light most favorable to the state, these facts do not reach the level of a "well-founded suspicion." Rather, the officers were acting upon an "inchoate and unparticularized suspicion"; a mere "hunch." See Terry, 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 904. Consideration of precedent replete with well founded suspicion confirms this conclusion.
In Lewis, a deputy sheriff observed a man leave a bar, approach a pickup truck in the parking lot, remove a large tool box from the truck bed, jump into a waiting vehicle with the tool box, and speed away rapidly. The deputy followed and stopped the getaway car. Under these facts, this court was "convinced" that "the deputy had a well-founded suspicion that appellee had been engaged in criminal activity," Lewis, at 79, and therefore, we reversed the order granting a motion to suppress.
In Codie v. State, 406 So.2d 117 (Fla. 2d DCA 1981), we considered whether two cars parked in the side parking lot of a gas station and facing in opposite directions, with drivers adjacent to each other, demonstrated a "well-founded suspicion." In Codie, the sheriff's deputy who observed this activity knew that it was 12:15 a.m. and that the gas station was not open at that hour. Most significant, however, was the fact that the deputy knew the gas station owner and that neither of the cars belonged to that owner.
To reach a "well-founded suspicion" justifying an investigative stop, this court, in Codie, urged the evaluation of factors such as:
the time, location, physical appearance of the suspect, his behavior, the appearance and manner of operation of any vehicle involved, or anything incongruous or unusual in the situation [which suggests] possible illegal activity.
Codie, 406 So.2d at 119 (citing State v. Stevens, 354 So.2d 1244 (Fla. 4th DCA 1978)).
Applying these factors to the case at bar, it is clear that O'Mara and Byrus were basing their stop merely upon the "time" of day and the "location" of the appellant's car. "Physical appearance" was not considered; it was dark. "Behavior" was not considered; appellant was just sitting in a parked car. Nothing is unusual about that. "Appearance and manner of operation" of the car could not have been a factor. The car was parked and appellant merely started it when he decided to proceed on his way. Lastly, there was nothing "incongruous or unusual" suggesting "possible illegal activity." Though it may have been imprudent to park his car next to a boarded-up building, under a "No Trespassing" sign, late at night, such innocuous activity by the appellant did not create the requisite "well-founded suspicion" that criminal activity was "afoot." Furthermore, the reputation of the Henderson and Anderson intersection cannot be imputed, in this situation and to this appellant, in order to support an officer's "hunch" that a crime may be in progress.
Quite simply, the facts do not equal a "well-founded suspicion." Accordingly, we hold that the firearm and cannabis were "fruit" of an illegal stop and therefore, should have been suppressed by the court below. The order denying the motion to suppress is reversed and the cause is remanded with directions to vacate appellant's conviction.
DANAHY, A.C.J., and SCHEB, J., concur.