615 So.2d 727 (1993)
STATE of Florida, Appellant,
v.
Michael Claude HUNTER and Jerry Jay Chicone, III, Appellees.
No. 91-2810.
District Court of Appeal of Florida, Fifth District.
February 19, 1993.
Rehearing Denied April 1, 1993.
*728 Robert A. Butterworth, Atty. Gen., Tallahassee, and Anthony J. Golden, Asst. Atty. Gen., Daytona Beach, for appellant.
James M. Russ and Steven G. Mason of Law Offices of James M. Russ, P.A., Orlando, for appellee Jerry Jay Chicone, III.
Terrence E. Kehoe of Law Offices of Terrence E. Kehoe, Orlando, for appellee Michael Claude Hunter.
PETERSON, Judge.
The state appeals an order granting the motions of Michael Claude Hunter and Jerry Jay Chicone, III, to suppress evidence of, inter alia, illegal substances and drug paraphernalia discovered by Ocoee police officers in Chicone's pocket and in an automobile owned by Hunter in which Chicone was a passenger. We vacate the order of suppression.
At 11:02 P.M. on March 26, 1991, a 911 "open line" call[1] was received from a gas station clerk who said only that she could not talk. Three Ocoee police officers were dispatched in separate vehicles to the gas station which was located at a major commercial intersection. One of the officers, Morris, later testified that he treated the dispatch as an emergency situation and presumed that it was a robbery "because it sounded like it could be." The officers arrived within a few minutes and observed a white Honda parked next to a gas pump. Hunter was seated in the driver's seat with the door open and Chicone was standing between the Honda and a gas pump on the passenger side. A lone female clerk was inside the service building located between two rows of gas pumps. She was extremely distraught, crying, shaking, and almost hysterical. At that point, the officers did *729 not know why the clerk was upset since nothing else appeared out of order. The officers asked whether the two men by the Honda were involved, and she pointed to Chicone, saying, "The one in the white shirt."
Both men were ordered to the front of one of the police cars and told to keep their hands visible; they submitted to a patdown during which a hard, small, cylindrical object was felt in the front pocket of Chicone's baggy shorts. The officer conducting the patdown later testified:
I did not know what the man had. I didn't know if it was a syringe, as I indicated in my report, or some other type of stabbing weapon. You could be stabbed with a syringe. Especially with the problems of AIDS or anything else, I don't want to be stabbed.
When the officer removed the object from Chicone's pocket, it turned out to be a short, clear plastic straw coated with a white powdery substance. Chicone was immediately placed under arrest for possession of cocaine and drug paraphernalia. No contraband was found during Hunter's patdown, but he was not free to leave the scene. One of the officers testified at the suppression hearing that both Hunter and Chicone appeared to him to be "impaired."
Once the officers were assured that the two men posed no threat to their safety, they interviewed the clerk. During the ten-minute interview, she told the officers that Chicone had entered the store, selected a soft drink, and asked her if he could "bum" a cigarette. He then told the clerk that he had neither money nor gas. When the clerk asked what he was going to do, he came around to her side of the counter and, kneeling in front of her, made a lewd remark. He then offered her cocaine. He also told her that he knew the manager of the store and that, if she did not believe it, to call him on the telephone. That is when she faked the call and dialed 911.
The officers next approached Hunter, told him what they had found in Chicone's pocket, and, based upon Chicone's offer of cocaine to the clerk, asked Hunter whether any drugs were in the car. Hunter volunteered that the car was his and that there was a pipe in it that was used for smoking marijuana. The officers then asked whether they could search the car. Hunter first orally consented and then signed a written consent to search. While the officers awaited the arrival of a canine unit, a search of the Honda produced the marijuana pipe and, on the rear floorboard, a baggie that appeared to contain a small amount of marijuana.
The canine unit arrived at 11:50 P.M., and the dog alerted to the car's ashtray behind which were found three baggies containing small amounts of marijuana. When the dog pawed at the bottom of the passenger seat, a baggie containing a white powdery substance flew out of the car. It was later determined that the baggie contained cocaine. Hunter was then informed of his Miranda rights and was arrested.
The trial court suppressed the pipe and the contraband, finding that, while the original stop was valid, the patdowns were invalid. It also found illegal the continued detention of Hunter once the clerk had implicated only Chicone.
Several issues must be considered to determine whether suppression of the evidence was proper:
I. Whether the initial detentions of Chicone and Hunter were proper.
II. If the detentions were proper, whether the patdown searches were authorized.
III. Whether the scope of Chicone's patdown yielding the straw coated with cocaine was excessive.
IV. Whether Hunter's continued detention was improper, thus tainting his subsequent consent to search the Honda.

I. THE INITIAL DETENTIONS
The "Florida Stop and Frisk Law" allows a law enforcement officer who encounters any person under circumstances which reasonably indicate that such person has committed a crime to temporarily detain the suspect and ascertain identity and the circumstances that led the officer to *730 believe that a crime had been committed. §§ 901.151(1), (2), Fla. Stat. (1991). The reasonableness of this governmental intrusion is tested by weighing the need to search or seize against the invasion of privacy constitutionally guaranteed to a citizen. Terry v. Ohio, 392 U.S. 1, 20-21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). In justifying a stop, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21, 88 S.Ct. at 1880. "[T]he facts [must] be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search `warrant a man of reasonable caution in the belief' that the action taken was appropriate?" Terry, 392 U.S. at 21-22, 88 S.Ct. at 1880. To determine whether information is sufficient to support a reasonable suspicion, the court must assess the totality of the circumstances known to the law enforcement officer and determine whether an experienced law enforcement officer could draw inferences and make deductions that would raise a suspicion that the individual being stopped was engaged in wrongdoing. Tamer v. State, 484 So.2d 583 (Fla. 1986).
Hunter and Chicone assert that the police cannot justify a stop and detention based upon information which is acquired after the stop.[2]McCloud v. State, 491 So.2d 1164, 1166 (Fla. 2d DCA 1986); Ward v. State, 453 So.2d 517, 518 (Fla. 2d DCA 1984). They argue that the police cannot legitimize the detentions based upon after-acquired information obtained from the gas station clerk. Because we believe that the police had sufficient grounds to stop and frisk before learning of Chicone's behavior toward the clerk, we need not consider this argument. We do note, however, that the stops in McCloud and Ward were not based upon specific complaints by informants but were based solely upon observations of officers who were on routine patrol.
When the Ocoee police officers arrived at the scene pursuant to the 911 call, they did not know what to expect upon their arrival although they suspected that there was a robbery. What they witnessed was a lone, distraught clerk pointing in the direction of Chicone who appeared to be in the company of Hunter. The officers were faced with the alternative of either delaying action until learning the reasons for the 911 call and the distress of the clerk, whom they found pointing at Chicone upon their arrival, or first establishing security on the premises by neutralizing the two individuals who could pose a threat of danger to the clerk, the officers, or anyone who might happen onto the scene. We hold that the detentions of Hunter and Chicone were reasonable governmental intrusions as envisioned by the United States Supreme Court in Terry.
We hold that the officers reasonably suspected criminal activity was afoot where, within minutes of receipt of a late-evening 911 call, they arrived at a gas station attended by a lone clerk who was distraught and pointing in the direction of one of the two occupants of the premises and where the other occupant appeared to be the companion of the first. In so holding, we note that retail establishments of this type, often attended by lone clerks, are popular targets of armed robberies.
The Ocoee police officers were exercising a legitimate investigative function and exercised reasonable caution when they detained Chicone and Hunter, who reasonably appeared to be in Chicone's company. "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." Adams v. Williams, 407 U.S. 143, 145, 92 S.Ct. 1921, 1923, 32 L.Ed.2d *731 612 (1972). "A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." Id., 407 U.S. at 146, 92 S.Ct. at 1923.
Hunter and Chicone cite numerous authorities to support their position that the stops were illegal because the officers did not have a reasonable suspicion that a crime had been committed. Most concern anonymous informants.[3] The instant case does not involve an anonymous informant. The clerk was an identifiable citizen informant when the police officers arrived at the source of the 911 call. Hunter and Chicone argue that upon initial contact an informant must provide sufficient information to indicate criminal behavior and that the police must corroborate this at the scene. In other words, they argue that, since the clerk did not articulate that any specific crime was afoot, and since the officers never witnessed any criminal activity between the time they arrived and the time they made the stop, the officers did not have information sufficient to provide a basis for a legal stop. While corroboration would have been required had the clerk been an anonymous informant, she was not anonymous, and it was reasonable for the officers to believe that an emergency existed because of the dispatch pursuant to a 911 call and because of the lone clerk's demeanor upon their arrival at a type of establishment usually targeted for robberies.
In Lachs v. State, 366 So.2d 1223 (Fla. 4th DCA 1979), cited by Hunter and Chicone, a BOLO directed officers to a bar when an unidentified manager called the police to report that "a black male subject, dressed in a blue denim outfit with a hat and a white female subject ... in his company" were dealing in narcotics and smoking a marijuana cigarette. Id. at 1224-25. The female appellant claimed that the stop was predicated upon an anonymous BOLO on which the police were not entitled to place reliance without verification. The court held that the phone information was not an anonymous tip from an unknown tipster, but was from an identified citizen who gave his occupation and address. In the instant case, the 911 system's technology furnished the address of the citizen informant. The clerk's demeanor upon the officers' arrival was consistent with the 911 information and, we believe, was sufficient to identify initially the individual who had placed the emergency call. The only material difference between Lachs and the instant case is the absence of a pre-stop accusatory communication. We agree with the trial judge that, under the circumstances of this case, the stops were proper even though they were made prior to the determination of the exact complaint furnished by the clerk within minutes after the stop.
Our agreement is influenced by State v. Stevens, 354 So.2d 1244 (Fla. 4th DCA 1978), and Lachs, 366 So.2d at 1226, which set forth criteria to determine whether the circumstances reasonably suggest a suspect's possible commission of a crime.
1. As to time  The 911 call was initiated during the nighttime hour of eleven o'clock. We find that hour to be significant since criminals favor the cover of darkness.
2. As to day of the week  This factor is not shown to be relevant in this case.
3. As to location  Chicone plays down this factor by arguing that the location was in a busy commercial district and does not have a reputation as a high crime area. However, no place seems immune from crime today, and establishments that sell self-service gasoline are popular targets for armed and often violent robberies.
4. As to physical appearance of the suspects  The clerk clearly identified the suspect through gestures in response to police inquiry before the stop was initiated.

*732 5. As to behavior  The behavior of the defendants was normal here, but the clerk's was not.
6. As to appearance and operation of an involved motor vehicle  This is inapplicable here.
7. As to incongruity  The circumstances were not necessarily incongruous. However, the circumstances were consistent with criminality. The clerk's emotional state and her gestures toward the defendants were consistent with what police would expect to find in response to a 911 call. These circumstances led to the almost inescapable suspicion that a robbery, a common occurrence at such businesses, was afoot.
8. As to reliability of the BOLO  The clerk was a citizen informant whose unusual demeanor supported a belief that the 911 call was justified.
The presence of all of the factors is not required to give rise to a founded suspicion. Lachs, 366 So.2d at 1226. We are convinced that the sum of the factors present in the instant case equate to circumstances giving rise to a reasonably founded suspicion that crime was afoot.

II. THE PATDOWN SEARCHES
As previously noted, a straw coated with a white, powdery substance was obtained as a result of the patdown of Chicone. To justify a patdown, an officer must have a reasonable belief that the subject is armed and dangerous. Ybarra v. Illinois, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). We have already commented upon the popularity of the type of retail establishment involved in this incident as a target for armed robbery, particularly at night. If a founded suspicion that such a serious crime reasonably exists, it must follow that the officers must assure the safety of the public and themselves by making sure that weapons are not available to the suspects. Justice Harlan stated in his concurrence in Terry:
Where such a stop is reasonable, however, the right to frisk must be immediate and automatic if the reason for the stop is, as here, an articulable suspicion of a crime of violence... . [A] limited frisk incident to a lawful stop must often be rapid and routine. There is no reason why an officer, rightfully but forcibly confronting a person suspected of a serious crime, should have to ask one question and take the risk that the answer might be a bullet.
Terry, 392 U.S. at 33, 88 S.Ct. at 1886 (Harlan, J., concurring). A reasonable suspicion of commission of a crime of violence, a robbery, in and of itself validates a patdown for weapons. Russell v. State, 415 So.2d 797 (Fla. 3d DCA 1982), review denied, 427 So.2d 737 (Fla. 1983). Since the officers had a reasonable suspicion that violent crime was afoot, they were justified in patting down Hunter and Chicone for weapons.

III. THE SCOPE OF THE PATDOWNS
Chicone argues that, even if the patdown was justified, the scope of the search exceeded that which was necessary to eliminate the possibility of the existence of weapons. The only item found on Chicone was a plastic straw.
In T.P. v. State, 585 So.2d 1020 (Fla. 5th DCA 1991), the police were on routine patrol at 1 A.M. when they observed T.P. lying half in and half out of the rear passenger side of a vehicle in an otherwise vacant parking lot. The parking lot was located in a high drug area where police had recovered numerous stolen vehicles which had been stripped of their stereo equipment. The officers observed a bulge in T.P.'s right front pocket and feared that it could be a new, unconventional weapon described in police bulletins, such as a firing mechanism as small as a fountain pen or a pager converted to a .22-caliber pistol. The object felt hard during a patdown but when removed the object was discovered to be a vial of cocaine. This court held:
Based on the foregoing totality of the circumstances, the officers could have had a reasonable and founded suspicion that T.P. was engaged in criminal activity and they rightfully could detain him. Freeman v. State, 559 So.2d 295 (Fla. 1st *733 DCA 1990); State v. Pye, 551 So.2d 1237 (Fla. 1st DCA 1989). They also rightfully could search T.P. for weapons, if there were probable cause to think he was armed, or if the officers were reasonably justified in believing he was armed and dangerous. Both circumstances were met in this case by the officer's testimony and the facts they presented.
Id. 585 So.2d at 1021 (footnotes omitted). This court's opinion also noted that the trial court believed the officer's testimony about new and unconventional weapons, that the trial court found that the officer had a reasonable basis for the suspicion, and that an appellate court cannot reject a trial court's findings.
In the instant case, the trial court stated at the suppression hearing that the officer "might have reasonably believed [the straw] might have been a weapon, to-wit, a syringe." Asked to rule upon whether the officer had legal grounds for extracting the object from Chicone's pocket, assuming the initial patdown was valid, the court held:
It's a very, very, close question, but I would err on the side of caution for the state.
I would rule that the officer was justified. That a reasonable person would have believed that it may or may not have been a syringe.
Both the straw found in Chicone's pocket and small insulin syringes were included in the record on appeal. The straw is not significantly shorter than the syringes and actually is larger in diameter than the syringes. The straw is made of a clear plastic, and, while not as solid as a plastic syringe, its tubular shape would not be easily distorted in a gentle patdown of the type described by the Ocoee police officer. Of course, the straw does not have a needle or the two short appendages located on the end of a syringe designed to aid in depressing the plunger, but we do not determine as a matter of law that this is a significant difference when the articles are located in the pocket of the baggy shorts worn by Chicone.
Chicone argues that the officer should have conducted a more thorough patdown of the object in his pocket before removing it to discover the differences. If she had, she would have noted the absence of a flange and a needle and would have rejected the suspicion that the object was a syringe. However, by making a more thorough patdown, the officer would have exposed herself to being pricked by a potentially deadly needle had the object been a syringe.
Relying upon Doctor v. State, 596 So.2d 442 (Fla. 1992), Chicone also argues that during the course of a legitimate frisk for weapons, the police may only seize weapons or objects which reasonably could be weapons despite the fact that the officer may reasonably suspect that the object may be evidence of a crime. The supreme court stated the rule in the context of where a legitimate frisk for weapons reveals no weapons but where there is a suspicion, as opposed to probable cause, that the yet unidentified object is contraband. Doctor stands for the proposition that, absent a reasonable suspicion that the object is a weapon, the object may not be seized. If, on the other hand, circumstances give rise to probable cause to believe the object is contraband, it may be seized notwithstanding the absence of a reasonable suspicion that the object is a weapon.
Our conclusion is influenced by Doctor's unqualified approval of the decision in Dunn v. State, 382 So.2d 727 (Fla. 2nd DCA 1980). Dunn addressed the last sentence of subsection 901.151(5) which provides that, if "such a search discloses such a weapon or any evidence of a criminal offense, it may be seized." Dunn expressly held that:
[T]he last sentence of subsection [901.151(5), Florida Statutes] means only that if in the course of a legal stop and frisk, a law enforcement officer removes from a suspect's possession an object which he believes might be a weapon, but finds that instead of it being a weapon it is "evidence of a criminal offense," he may still seize it. The seizure of contraband *734 or other evidence of a crime during a legal stop and frisk is permissible so long as the officer reasonably believes the object which he is acquiring might be a weapon.
Dunn, 382 So.2d at 730. The rule of law expressed in Dunn fits the fact pattern in the instant case. The police officer conducting the patdown had a reasonable belief that the straw might be a weapon up to the time it was removed from Chicone's pocket for examination.
After being directed to a possible crime site as a result of a 911 call, law enforcement officers should not be required to expose themselves and the public to the possibility of injury during the time interval necessary to obtain all details from a distraught clerk who is pointing towards the suspects. If Chicone and Hunter had been perpetrators of a robbery, this delay could have allowed them to use weapons or to escape and could have resulted in a dangerous chase, during which innocent motorists and pedestrians would have been placed at risk. We see no reason to handicap law enforcement in the exercise of their duties to the extent urged by Chicone.
We conclude that the officer was justified in taking the item out of Chicone's pocket as a result of a legitimate frisk for weapons and the officer's reasonable belief that the object she felt was a syringe that could be used as a weapon. The discovery that the officer was mistaken once the true identity of the object was known is not a ground for suppression of the straw. Doctor, 596 So.2d 442; Dunn, 382 So.2d 727.

IV. CONTINUED DETENTION OF HUNTER
When the officers had completed their interview of the clerk, they had a reasonable suspicion that cocaine was available to Chicone since he had offered some to the clerk. There was no cocaine on Chicone's person other than the possible cocaine that coated the straw. Since Chicone appeared to be traveling in the Honda, it was reasonable to suspect that the Honda owned by Hunter might contain drugs. This suspicion was reinforced by the discovery of the white powdery substance on the straw and by the officer's belief that both Chicone and Hunter were impaired. This led to the police request for Hunter's permission to search the Honda. Hunter gave oral and then written permission to search the Honda, as well as volunteering the information that the Honda contained a pipe that he used to smoke marijuana.
Hunter argues that, once the clerk failed to implicate him in any criminal activity, he should not have been detained longer and asked for consent to a search of the Honda. He is correct in pointing out that, when there is no founded suspicion of criminal activity, detention beyond the time necessary to issue a citation is illegal. Blue v. State, 592 So.2d 1263 (Fla. 2d DCA 1992); Dunbar v. State, 592 So.2d 1230 (Fla. 2d DCA 1992); Joseph v. State, 588 So.2d 1014 (Fla. 2d DCA 1991). However, in the instant case, although the clerk failed to implicate Hunter, the officers had a founded suspicion that there may be drugs in the Honda as a result of Chicone's offer of drugs to the clerk, the discovery of the straw coated with a white powdery substance, and Chicone's proximity to the Honda with the open passenger door. These facts gave rise to a reasonable suspicion justifying further detention. Cresswell v. State, 564 So.2d 480 (Fla. 1990).

CONCLUSION
There being no Fourth Amendment violation in this case, the suppression order is reversed and the cause remanded for further proceedings consistent with this opinion.
REVERSED; REMANDED.
COBB and COWART, JJ., concur.
NOTES
[1] A "911 open line call" means that someone from the gas station location called 911 and did not hang up or disconnect the telephone.
[2] Chicone briefly mentions that the independent source doctrine of Segura v. United States, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), and the inevitable discovery doctrine of Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), are not applicable to this case. We agree only because the state failed to make this argument or present the evidence to support it during the suppression hearing.
[3] Whiting v. State, 595 So.2d 1070 (Fla. 2d DCA 1992); Mosby v. State, 575 So.2d 304 (Fla. 2d DCA 1991); Reed v. State, 577 So.2d 1362 (Fla. 2d DCA 1991).