# Third District Court of Appeal

## State of Florida

Opinion filed May 9, 2018.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D17-1597
Lower Tribunal No. 16-25699
_____

**The State of Florida,**
Appellant,

vs.

**Curtis Maxwell,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Milton Hirsch, Judge.

Pamela Jo Bondi, Attorney General and David Llanes, Assistant Attorney General, for appellant.

Carlos J. Martinez, Public Defender and Howard K. Blumberg, Special Assistant Public Defender, and Yamila Lorenzo and Shannon McGee, Certified Legal Interns, for appellee.

Before ROTHENBERG, C.J., and SALTER and SCALES, JJ.

SALTER, J.

The State of Florida appeals a circuit court order (the "Suppression Order") granting a motion to suppress physical evidence on the basis of an unlawful pat-down search of the appellee, Curtis Maxwell.  We reverse.

I.      <u>The Record—Detention, Pat-Down Search, and Arrest</u>

On December 26, 2016, at around midnight, officers Lee Clair and Kraig Bryan of the Miami Beach Police Department responded, within twenty to thirty seconds, to a dispatch call regarding a large fight at the TGI Fridays at 500 Ocean Drive. The dispatch call had advised "that it was a very large fight involving many people with tables and chairs being thrown."

Upon arrival to the scene, the officers were flagged down by a TGI Fridays waiter, who pointed to a nearby group of people who were walking northbound on Ocean Drive. The waiter said that the group was involved in the fight, but did not tell the officers whether the group was involved as perpetrators or victims. The group consisted of eight to ten people, including Mr. Maxwell, at least three young men, and four or five young women.  There were no other persons between the waiter and the group.

Responding to the tip, officers Clair and Bryan approached the group on their Department all-terrain vehicles (ATVs).   Both officers were in uniform. Neither had activated their Department-issued body cameras at that time.

2

Officer Clair testified Mr. Maxwell and a woman accompanying him made eye contact with the officers and one of the women in the group grabbed Maxwell in an attempt to run northbound on Ocean Drive. Officer Bryan, however, testified only that the persons in the group were walking fast when the officers approached; he told them to stop, and they did.

Officer Clair testified that his attention was quickly drawn to Mr. Maxwell, because he was one of the two persons in the group "trying to move quick at the time just prior to being stopped," and after that because he "began to act nervous. He was looking around, avoiding eye contact, and then he began to touch his jacket pocket." Officer Clair said that Mr. Maxwell was dressed in a "big heavy jacket" and he touched it with his right hand and then he would touch the same side with his left hand, "which is across his body which seemed out of context."

After observing Mr. Maxwell repeat these touches to his jacket, Officer Clair suspected that Mr. Maxwell was carrying a weapon and "had him walk over so I could conduct a pat down for weapons." Officer Clair testified that his suspicions were raised because Mr. Maxwell's repeated touches to his jacket were "not a natural behavior that people do," and because he had been trained "when people carry a firearm they subconsciously touch the firearm whether it be with their arm or their hands."

3

Officer Clair asked Mr. Maxwell to step over to his ATV, "and he hesitated he kept his arms at his side" when asked three times to put his arms on the officer's ATV so his hands would be on it. Officer Clair finally placed Mr. Maxwell's hands on the ATV and conducted the pat search. When he touched the right side of Mr. Maxwell's jacket, "I immediately felt the firearm."

Officer Bryan then came over to remove the firearm from Mr. Maxwell's jacket. During a further pat down of Mr. Maxwell, a bag of marijuana was recovered. Mr. Maxwell was arrested and ultimately charged with carrying a concealed firearm and unlawful possession of cannabis.

## II.  The Suppression Order

The defense filed a motion to suppress the firearm and marijuana.[1] The trial court heard the testimony of the two officers, heard argument of counsel, and considered legal memoranda on the issues.

In the detailed ten-page Suppression Order, the trial court granted the motion to suppress as to both the firearm and the marijuana, though

---

[1] The "Motion to Suppress Physical Evidence and Notice of Hearing" filed on behalf of Mr. Maxwell focused on the detention without a warrant, not on the probable cause for the subsequent pat-down search on grounds of officer safety. The motion claimed that the officers' suspicion directed to the group that included Mr. Maxwell "does not provide a lawful basis to seize each individual in that group." The trial court properly rejected that argument and found that the investigative stop was lawful under Terry v. Ohio, 392 U.S. 1 (1968). Mr. Maxwell's objection to the pat-down search as a separate issue was raised orally during a hearing on the motion.

acknowledging (appropriately) that Mr. Maxwell's detention "was in conformity with the requirements of law," based on information reported to the officers that a "melee had broken out" at TGI Fridays. The trial court found "a sufficient basis for the officers to detain the group and make brief, reasonable inquiries," and "nothing objectionable about the detention itself."

The trial court's assessment of the pat-down search, and its application of law to the historical facts, however, led it to conclude that the officers lacked an "articulable reasonable suspicion" or "probable cause" to support the pat-down search in conformance with applicable law. The trial court's rejection of case law provided by the State appears to have been grounded on several considerations:

- Neither Mr. Maxwell nor any of the members of his group "bore any indications of recent combat," and the initial report by the waiter did not mention any use of firearms or shots fired. The officers did not see "bruises, flowing blood, or fresh wounds."

- Although Mr. Maxwell did not testify, his repeated movements of both hands to his jacket may have reflected "his own apprehension," because "he was a very young black man confronted by two armed and uniformed police officers. His hand movements might have been nothing more than a nervous habit. He might have been feeling for his wallet, to assure himself that if the police demanded identification he could produce it."

5

- The trial court's concern on this point was reiterated several paragraphs later in the Suppression Order as a basis for distinguishing the present case from one cited by the State: "[N]ervousness on the part of a citizen confronted by uniformed and armed police officers is commonplace.  Mr. Maxwell is a young black man.  Reports of recent events in Ferguson, Missouri; or in Baltimore, Maryland; may weigh heavily on his mind and, rightly or wrongly, color his perception of police-citizen encounters."[2]

- The trial court concluded that the pat-down search "was not justified by a suspicion **based on more than speculation** that Mr. Maxwell was armed and presently dangerous."  (Emphasis provided).

The trial court granted the motion to suppress the firearm and a bag of marijuana, and this appeal followed.

III.   Analysis

A.    Standard of Review

We review the Suppression Order to determine whether competent substantial evidence supports the trial court's findings of historical fact.  State v.

---

[2]  This quotation from the Suppression Order was followed by a footnote to "Commonwealth v. Warren, 475 Mass. 530, 539 (Mass. 2016)," and  the trial court's observation with approval that "the Supreme Judicial Court of Massachusetts, taking cognizance of just such recent events, concluded that for a young man of color to run from police—particularly in a 'high crime area' and in the dark of night—does not contribute to the calculus of articulable reasonable suspicion and may simply be evidence of a prudent sense of self-preservation." The opinion in Warren is addressed further below.

Roman, 983 So. 2d 731, 734 (Fla. 3d DCA 2008). We review that evidence and any inferences from it in favor of supporting the trial court's ruling. Pagan v. State, 830 So. 2d 792, 806 (Fla. 2002).

But we must "independently review mixed questions of law and fact that ultimately determine constitutional issues." Schoenwetter v. State, 931 So. 2d 857, 866 (Fla. 2006). The trial court's application of law to the facts in finding reasonable suspicion is subject to de novo review. State v. Cruse, 121 So. 3d 91, 95 (Fla. 3d DCA 2013) (citing Ornelas v. United States, 517 U.S. 690, 697 (1996)).

        B.     "Reasonable, Articulable Suspicion" and "Probable Cause"

Under the Fourth Amendment of the U.S. Constitution and Florida law, an officer may conduct an investigatory stop or temporary stop when there is a reasonable, articulable suspicion that an individual has committed, is committing, or is about to commit a crime. Mackey v. State, 124 So. 3d 176, 183 (Fla. 2013); see also § 901.151(2), Fla. Stat. (2017) (the "Florida Stop and Frisk Law").

In addition to a lawful detention, a police officer may conduct a "pat-down of the suspect if the officer has a reasonable belief that the suspect 'is armed with a dangerous weapon and therefore offers a threat to the safety of the officer or any other person. . . .'" D.H. v. State, 121 So. 3d 76, 80 (Fla. 3d DCA 2013) (quoting § 901.151(5)). More specifically, Florida's "Stop and Frisk Law" provides:

7

> Whenever any law enforcement officer authorized to detain temporarily any person under the provisions of subsection (2) has probable cause to believe that any person whom the officer has temporarily detained, or is about to detain temporarily, is armed with a dangerous weapon and therefore offers a threat to the safety of the officer or any other person, the officer may search such person so temporarily detained only to the extent necessary to disclose, and for the purpose of disclosing, the presence of such weapon. If such a search discloses such a weapon or any evidence of a criminal offense it may be seized.

§ 901.151(5).

In the context of a stop and frisk, the term "probable cause" "has been construed to mean 'articulable suspicion,' 'reasonable belief,' or 'founded suspicion.'" Cole v. State, 190 So. 3d 185, 188 (Fla. 3d DCA 2016). In the present case, Mr. Maxwell does not contest whether the stop was lawful, and as noted, the trial court found that Mr. Maxwell's detention was "in conformity with the requirements of law."

It is also worth noting that the pat-down or "frisk" was limited at its outset to Mr. Maxwell's jacket, where Officer Clair's training and observations of Mr. Maxwell's unusual hand movements had focused the officer's attention. The search, in short, was "only to the extent necessary to disclose, and for the purpose of disclosing" the presence of a dangerous weapon, as authorized by section 901.151(5).

The sole question, then, is whether the trial court followed applicable law in evaluating whether Officer Clair had probable cause to believe that Mr. Maxwell

8

was armed with a dangerous weapon and offered a threat to the safety of the officer or any other person. We conclude that the trial court failed to follow the statute and applicable precedent for the three reasons which follow.

### 1. Credible Report of Violent Crime

The probable cause supporting the detention of the group outside TGI Fridays was based on the reliability of an identifiable, on-scene TGI Fridays waiter who told the nearby and promptly-dispatched officers that "a very large fight involving many people with tables and chairs being thrown" had just occurred. "[I]t would be foolhardy for an officer to encounter an individual suspected of a serious and violent felony without taking the most basic safeguard for his personal safety." Russell v. State, 415 So. 2d 797, 798 (Fla. 3d DCA 1982).

In this case, the trial court discounted such a concern because there was no evidence "that shots were fired, or that the fight involved the use of firearms." But no such evidence is required—a report of robbery, for example, with no evidence of shots fired or a firearm, was a substantial part of the evidence sustaining a stop and frisk in State v. Hunter, 615 So. 2d 727 (Fla. 5th DCA 1993).

### 2. Nervousness and Unusual Hand Movements

Officer Clair's testimony was uncontradicted on two points regarding Mr. Maxwell's behavior and repeated, unusual hand movements—with one hand and then the other—touching the pocket of his "big heavy jacket." First, Officer Clair

9

described the movements and testified that Mr. Maxwell's nervousness and failure to make eye contact immediately drew the officer's attention to Mr. Maxwell rather than the other members of the group. Second, he described his law enforcement training: "when people carry a firearm they subconsciously touch the firearm whether it be with their arm or their hands." "A pat-down for weapons is justified when a police officer, **in light of his experience**, has a reasonable suspicion that the detainee is armed and dangerous." Enich v. State, 838 So. 2d 1216, 1218 (Fla. 3d DCA 2003) (emphasis provided).

Nervous gestures by a detained individual are one of the indicia described in pat-down cases as a basis for heightened officer concern that the individual may be concealing a weapon. See, e.g., Illinois v. Wardlow, 528 U.S. 119, 124 (2000) ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion."); Brown v. State, 863 So. 2d 459, 460 (Fla. 5th DCA 2004) (passenger "fidgeting as though he were trying to conceal something"); Johnson v. State, 785 So. 2d 1224, 1227 (Fla. 4th DCA 2001) (defendant "acting very nervous" and "looking around constantly").

It is not for the trial court to speculate regarding Mr. Maxwell's apprehension and the possible reasons for his hand movements when there is no such evidence in the record (for example, any evidence regarding Mr. Maxwell's

perception of recent events in Ferguson Missouri, or Baltimore, Maryland).

### 3. The Warren Case Is Distinguishable

The Massachusetts appellate opinion noted by the trial court in the present case, Commonwealth v. Warren, 58 N.E. 3d 333 (Mass. 2016), addressed a completely different record, a detention which was challenged (as well as the subsequent pat-down search), "mere conjecture" regarding the perpetrator's direction and path of flight, and lack of detail regarding the persons who were stopped. We further observe that in Warren the appellate court relied in part on "the findings in a recent Boston Police Department (department) report documenting a pattern of racial profiling of black males in the city of Boston." Id. at 342. No such report or evidence appears in the case before us.

### IV. Conclusion

Upon the application of applicable federal and Florida cases to the record evidence regarding the stop and limited pat-down search in this case, the motion to suppress should have been denied. We reverse and vacate the Suppression Order and instruct the trial court to enter an order denying the motion.

Reversed and remanded with directions.