571 So.2d 1358 (1990)
STATE of Florida, Appellant,
v.
Anthony LOUIS, Appellee.
No. 89-2459.
District Court of Appeal of Florida, Fourth District.
December 5, 1990.
Rehearing Denied January 24, 1991.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Don M. Rogers, Asst. Atty. Gen., West Palm Beach, for appellant.
Richard L. Jorandby, Public Defender, and Louis G. Carres, Asst. Public Defender, West Palm Beach, for appellee.
GARRETT, Judge.
The State appeals the trial court's granting of appellee's motion to suppress.
Officer Weiner (Weiner) saw that the car in which appellee was riding as a passenger did not have a tag light. Weiner activated his police vehicle's emergency siren and told the driver to pull over. When Weiner approached the driver, appellee "all of a sudden bailed out of the vehicle." Weiner thought something was wrong and followed appellee who walked very quickly to the left front of the car, then to the right rear of the car. Weiner stopped his pursuit "mainly for cover because if [appellee] was to drop down in front of the car, ... I would immediately get hit because there [was] no cover for me." Weiner feared for his safety and several times asked appellee to stop. Appellee responded by placing his hands out of sight inside his bulky jacket. Weiner drew his weapon and told appellee to take his hands out of the jacket. Appellee complied, but threw a manila envelope to the ground. Weiner picked up the envelope *1359 and saw the word, "bulba," written on it. Based on his training and experience, Weiner believed that the envelope was a common method to carry drugs and the writing was street talk for cannabis or cocaine. He opened the envelope and saw that it contained five cocaine rocks. Appellee was arrested and charged with possession of cocaine. The trial judge granted appellee's motion to suppress on the authority of Johnson v. State, 547 So.2d 699 (Fla. 1st DCA 1989) (police officer lacked sufficient articulable facts supporting investigatory stop and improperly reached into defendant's pocket in attempt to ascertain identification).[1]
We reverse. To neutralize the scene of the traffic stop and prevent accidental injury from passing traffic, Weiner had the right to order appellee to stop his unusual behavior and stand still. An officer has a duty to protect an unarrested occupant of a stopped automobile from roadside injury. See Kaisner v. Kolb, 543 So.2d 732 (Fla. 1989).
Weiner also had the right to stop appellee and frisk him for weapons. During a temporary encounter with a citizen, an officer, while engaged in a traffic investigation, may conduct a limited protective search of that citizen for weapons, even without probable cause to believe that a crime has been committed. The officer needs only to have reason to believe, based on articulable facts, that his safety is in danger. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Graham v. State, 495 So.2d 852, 854 (Fla. 4th DCA 1986). Tragically, roadside shootings of police officers in this state and country are frequent enough to be on the mind of every officer who makes a traffic stop. A person's unusual body movements and demeanor during an encounter with an officer gives the officer reason to believe the person has a weapon. State v. Wilson, 566 So.2d 585, 587 (Fla. 2d DCA 1990). Under the circumstances that existed at the time of the encounter, Weiner's fear for his safety was warranted since he reasonably believed that appellee might have a weapon in his jacket pocket. See Graham, 495 So.2d at 854.
Also, Weiner had the right to draw his revolver and order appellant to take his hands out of the jacket. No officer should be required to frisk an individual thought to possess a weapon while the individual has his hands out of sight in the pockets of a jacket. We are asked to weigh the intrusion into appellee's personal liberty occasioned not by the initial stop of the vehicle, which was justified, but by an order given outside the car. We think this additional intrusion can only be described as de minimis. Appellee was asked to expose to view very little more of his person than was already exposed. See Pennsylvania v. Mimms, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). "What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety." Mimms, 434 U.S. at 111, 98 S.Ct. at 333, 54 L.Ed.2d at 337.
In complying with the order to expose his hands, appellee freely and voluntarily abandoned the manila envelope by removing it from his jacket pocket and throwing it to the ground. Appellee cannot challenge the search and seizure of property he freely and voluntarily abandoned. Abel v. United States, 362 U.S. 217, 240-41, 80 S.Ct. 683, 698, 4 L.Ed.2d 668, 686, reh'g denied, 362 U.S. 984, 80 S.Ct. 1056, 4 L.Ed.2d 1019 (1960); Compare State v. LaSalla, 536 So.2d 1037, 1038 (Fla. 4th DCA 1988) (evidence from abandonment after unlawful seizure is not free and voluntary and must be suppressed).
Accordingly, we reverse the order of suppression and remand for further proceedings consistent with this opinion.
REVERSED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.
*1360 DELL, J., concurs.
GLICKSTEIN, J., dissents with opinion.
GLICKSTEIN, Judge, dissenting.
I compliment our colleague on his opinion, which reflects a lot of work and thought but, nevertheless, would affirm the trial court's reliance upon Johnson v. State, 547 So.2d 699 (Fla. 1st DCA 1989).
Having authored State v. Patrick, 437 So.2d 217 (Fla. 4th DCA 1983), and Cheatem v. State, 416 So.2d 35 (Fla. 4th DCA 1982), I am concerned for law officers' safety, but am equally concerned for Fourth Amendment protection of individual citizens.
The question in the present case is when the officer seized the defendant and whether there was a right to do so when he did it. If the seizure occurred when the passenger "bailed out" of the passenger side of the vehicle hurriedly, i.e., not in a normal or casual way, then every hurried exit from a vehicle for personal necessities would become a basis to stop  an intolerable prospect.
The testimony of the officer was:
A I exited my vehicle and approached the driver and started to approach the window of the driver and said, driver's license and registration, at which time the Defendant all of a sudden bailed out of the vehicle.
Q What do you mean by "bailed out of the vehicle?"
A Jumped out of the vehicle in a hurried fashion, not a normal open the door and exited the vehicle.
Q Okay.
A He went ahead and exited the vehicle and hesitated and then started walking around to the front of the vehicle very quickly.
Q Could you see him? Could you clearly see him when he was walking around or was the car obscuring him?
A I could see him.
Q What did you do then?
A I immediately said to myself there is something wrong here. I followed him around and I went from the left side of the vehicle, followed him around to the back over to the right side of the vehicle and started following him and asked him to stop. [Emphasis added.]
Q Was there any reason that you did not go around the other way?
A Mainly for cover because if he was to drop down in front of the car, when he was in the front of the car I would immediately get hit because there is no cover for me.
Q All right. Give us a little more detail. Could you catch up to him when he went around the front?
A I exited my  I mean he exited the vehicle. I followed him around the vehicle and he made it to the left front bumper area and that is exactly were [sic] I was, a couple, twenty-four, thirty-six inches away  thirty feet away from him. I kept saying stop, stop, stop and he placed his hands inside his bulky clothing which I believe he had a shirt and a coat on.
Q Can you show us?
A His hands were inside here like this (indicating).
Q Was it inside or up under 
A In other words he covered his hands inside his clothing. He obscured his hands. I couldn't see his hands. He put it inside his clothes. He had a brown bulky jacket.
Q At this point what did you do when you saw him?
A I pulled my weapon out and had it in a ready position and told him to take his hands out of his clothing.
Q And what happened?
A He immediately discarded  He had a manila envelope that came out of his hands on to the ground. He threw it on the ground.
Q What did you do then?
A I still had my weapon out and I pulled my weapon back. I had additional units to back me up. I walked over to him, grabbed him by the pants and walked over and grabbed the envelope.
Q What did you do then?

*1361 A I looked inside the envelope and then immediately recognized it as being a narcotic type envelope, because with my experience and everything there was certain writing on the envelope that in my previous narcotics arrest meant something. I believe it was worded "bubla" (phonetic). That is commonly associated with cannabis or cocaine inside the envelope.
Q And what did you do then?
A I picked up his abandoned property and looked inside the envelope and saw five yellowish  five white rocks, which is also associated with crack cocaine.
Q What did you do then?
A Took the Defendant and placed him in the back seat of the car. I went into the trunk of the vehicle and got the narcotics kit. I did a field chemical test.
Q What was the result of that?
A I did a chemical test with cobalt acid and it turned purple and it showed the presence of cocaine.
Q After you did that testing, what did you do?
A I went ahead and closed up my trunk with the narcotics kit and told the Defendant he was under arrest for possession of cocaine.
Later, the following question and answer appear:
Q Ms. Porter has indicated a couple of times in her questioning as if Mr. Louis was just walking away from the car. As I understand from your testimony, it was his hasty mannerism, the speed at which he was moving away and all these factors which alarmed you?
A Correct. To me he had no reason to do that when I was stopping the other person who was driving the vehicle. That is why I felt there was no reason for him to step out of the car.
The testimony, fairly read, does not reflect a panicked officer seizing the passenger when he "bailed out." It does reflect, however, the officer's seizing the passenger as he followed him around the vehicle, having become suspicious of his "bailing out." In my view, the trial court could properly rely upon Johnson, as it did, having the officer's testimony transcribed to read before ruling. While the majority chooses to overrule the trial court, I choose to support its discretionary call. The majority opinion does not convince me to do otherwise.
NOTES
[1] We note that at no time did the officer in Johnson believe the defendant possessed a weapon. "When asked whether he thought the object in [defendant's] pocket was a weapon, the officer candidly stated that he did not see the outline of a gun; rather, the bulge in [defendant's] pocket had the outline or appearance of a wallet." Id. at 701.