ROTHENBERG, J.
The State of Florida appeals the trial court’s order granting the defendant’s motion to suppress evidence of a firearm found in his possession. Based on the following facts and authorities, we reverse and remand to the trial court with instructions to vacate the order of suppression and to enter an order denying the motion to suppress.
BACKGROUND
The defendant, Saivon K. Cruse, was charged with carrying a concealed firearm and with possession of cannabis. The issue on appeal is whether the trial court erred in granting the defendant’s motion to suppress the firearm found in his possession by finding that the firearm was the product of an illegal search. The State claims that the search was legal because the officer’s initial investigative stop of the defendant was supported by reasonable suspicion, and the resulting pat-down was supported by the officer’s concern for his safety. In support of its position that the evidence was legally obtained and in opposition of the defendant’s motion to suppress its introduction, the State presented the testimony of Officer Dunaske and Officer Sanchez, the two officers who effectuated the investigative stop and subsequent “pat-down” of the defendant leading to discovery of the firearm at issue.
Officer Sanchez testified that he and Officer Dunaske were patrolling a high-crime area, known for guns, shootings, and illegal drugs, at ten o’clock in the evening, when they observed three males standing in a poorly-lit vacant lot. Although the lot was quite large, the officers noted that the men were standing next to a chain link fence and appeared to be looking into the *94 house on the other side of the fence. The officers testified that, based on their experience and training, they believed that this conduct was consistent with the men “casing” the house in preparation of a burglary. This aroused the officers’ suspicion and they turned their marked police vehicle around in order to better observe the men. Upon seeing the marked patrol car, however, the men immediately dispersed and began to walk away in three different directions.
At that point, the officers shone a spotlight on the lot and Officer Dunaske advised Officer Sanchez that the defendant was “holding his waistband and manipulating something in his waistband” as if the defendant was attempting to conceal a weapon. Officer Dunaske testified that, based on his training from recruit school, SWAT school, and Special Tactic school, this gesture was “one of the known indicators” that someone was carrying a gun. Officer Sanchez further explained that the officers were particularly concerned by the defendant’s movements, which indicated that he may be concealing a weapon, because the police had received reports of an incident involving the firing of assault weapons in the area the previous night.
The officers testified that because of the high-crime nature of the neighborhood, and its history of incidents involving guns, the officers generally avoided one-on-one confrontations in that area. Because of the defendant’s movements witnessed by Officer Sanchez, the fact that the men dispersed in different directions, and the officers’ concern for their safety, the two officers decided to approach the defendant as a team. Officer Sanchez made contact with the defendant and Officer Dunaske provided cover.
When Officer Sanchez approached the defendant and asked if he would mind answering a few questions, the defendant stopped and faced the officer. Officer Sanchez then asked the defendant if he had any weapons or illegal items on him. The defendant responded by raising both of his hands in the air. At that point, Officer Sanchez asked the defendant for permission to conduct a pat-down for officer safety purposes. The defendant cooperated by moving towards the front of the police car, where Officer Sanchez conducted the pat-down and found the firearm at issue in the defendant’s right waistband. The defendant was then handcuffed and placed in the back of the police vehicle. Officer Sanchez testified that at one point he asked the defendant if the defendant had a concealed weapons permit and the defendant replied that he did not.
Officer Dunaske, who also testified at the hearing on the defendant’s motion to suppress, explained that he and Officer Sanchez were members of a Rapid Action Deployment Squad, charged with violence suppression and assigned to “general hot spots.” Officer Dunaske also testified that the area the officers had been patrolling the night they came upon the defendant and the two other men was known to have a high volume of burglaries, shootings, and crack cocaine use, and that an officer had been shot with an assault weapon recently in that neighborhood. Because of its history of high-crime and frequent incidents involving the use of guns, Officer Dunaske explained that the officers avoided one-on-one engagement of suspects in that area. Accordingly, he and Officer Sanchez decided to pursue only one of the three men when the men dispersed and started walking away from the officers. Officer Du-naske further testified that because he had noticed the defendant manipulate his right side in a manner consistent with trying to keep an un-holstered gun from slipping, Officer Dunaske and Officer Sanchez had elected to pursue the defendant.
*95 The State argued, that based on the totality of the circumstances: the men were in a poorly-lit, high-crime area late at night, engaging in conduct consistent with casing a house; the men dispersed immediately upon seeing the police; and Officer Dunaske observed the defendant manipulating what he believed was a firearm in the defendant’s waistband, there existed a reasonable suspicion justifying the approach, detainment and pat-down of the defendant. The trial court, however, held that while the facts may have supported a consensual encounter, they did not give rise to the level necessary to support detainment and the pat-down of the defendant, and it therefore granted the defendant’s motion to suppress the evidence.
DISCUSSION
A trial court’s ruling on the suppression of evidence typically comes to this Court clothed with a presumption of correctness, and the appellate court reviews all evidence and makes all inferences in favor of supporting the trial court’s ruling. Pagan v. State, 830 So.2d 792, 806 (Fla.2002); State v. Manuel, 796 So.2d 602, 604 (Fla. 4th DCA 2001). The trial court’s order granting a motion to suppress, however, is subject to a mixed standard of appellate review. While the trial court’s findings of fact are binding on the appellate court and are only subject to review for clear error, the trial court’s application of law to the facts in finding reasonable suspicion is subject to de novo review. Ornelas v. United States, 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (underscoring that the appellate court must conduct an independent review of the ultimate determination of whether reasonable suspicion or probable cause exists by its own application of the facts to the legal rules because those rules only acquire content through their application). Accordingly, this Court accepts the trial court’s findings of fact and reviews de novo whether the trial court correctly applied the law to the facts in the record to find that the firearm found in the defendant’s possession by Officer Sanchez was discovered as the result of an illegal search and should be suppressed.
The particular level of “suspicion or cause” necessary to support a police-citizen encounter varies based on the level of the encounter. See Popple v. State, 626 So.2d 185, 186 (Fla.1993). For example, because an initial encounter, during which an officer merely approaches and asks a citizen routine questions such as the name or address of the citizen, is minimally intrusive and does not give rise to any constitutional issues, such an encounter does not require any justification, cause, or suspicion by the officer. Patrick v. State, 104 So.3d 1046, 1060 (Fla.2012) (describing the consensual encounter as one where a citizen’s decision to comply is voluntary and one which does not require constitutional safeguards) (citing United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). On the other hand, the second level of police-citizen encounter, an investigatory stop, known as a Terry-stop,[1] requires that the officer possess a reasonable suspicion that the citizen has committed, is committing, or is about to commit a crime in order to support the detention. § 901.151(2), Fla. Stat. (2011).[2] *96 Because this level of encounter affects the suspect’s Fourth Amendment rights, it invokes constitutional safeguards, and the stop must be supported by an officer’s well-founded, articulable suspicion of criminal activity. Popple, 626 So.2d at 186. The third, and most intrusive, level of police-citizen encounter involves an arrest, which must be supported by probable cause that a crime has been or is being committed. § 901.15, Fla. Stat. (2011); Henry v. United States, 361 U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959).
In addition, section 901.151(5) of the Florida Statutes (2011), known as the “Florida Stop and Frisk Law,” allows for the limited search of a lawfully detained suspect. The statute provides:
Whenever any law enforcement officer authorized to detain temporarily any person under the provisions of subsection (2) has probable cause to believe that any person whom the officer has temporarily detained, or is about to detain temporarily, is armed with a dangerous weapon and therefore offers a threat to the safety of the officer or any other person, the officer may search such person so temporarily detained only to the extent necessary to disclose, and for the purpose of disclosing, the presence of such weapon. If such a search discloses such a weapon or any evidence of a criminal offense it may be seized.
§ 901.151(5).
The Florida Supreme Court has clarified that when the term “probable cause” is used in section 901.151, the term means reasonable belief or suspicion, and does not rise to the level of justification required for an arrest. Smith v. State, 925 So.2d 465, 467 (Fla. 4th DCA 2006) (citing State v. Webb, 398 So.2d 820 (Fla.1981)). Therefore, in order to justify their search of the defendant, that resulted in discovery of the firearm at issue, the officers must have possessed a reasonable belief that the defendant was armed and presented a threat to their safety. Moreover, the search of the defendant had to be strictly limited to the extent necessary to reveal the weapon and protect the officers. Once the search is authorized pursuant to section 901.151(5), any evidence of criminal activity or weapon resulting from the search is admissible. § 901.151(6), Fla. Stat. (2011).[3] Accordingly, if the defendant was legally detained pursuant to section 901.151(2), and the firearm at issue was discovered as the result of a legal search, pursuant to section 901.151(5), and both the detention and the search were founded on the officers’ “reasonable, artic-ulable suspicion,” the firearm is admissible into evidence.
A. The Defendant was Legally Detained
The trial court found that while the circumstances supported an initial consensual encounter with the defendant, they did not give rise to a level that would support his detention. We disagree with the trial court’s analysis, and find that the totality of the circumstances provided the *97 officers with sufficient cause to believe that a crime was being, or was about to be, committed. Accordingly, the defendant’s detention was lawfully supported by the officers’ reasonable and particularized suspicion, which the officers were able to, and did, adequately articulate at the hearing on the defendant’s motion to suppress.
In determining whether an officer’s suspicion is reasonable or well-founded, the trial court must apply an objective standard. Hernandez v. State, 784 So.2d 1124, 1128 (Fla. 3d DCA 1999) (underscoring that a court is not bound by the officer’s subjective intent or motivation on the issue of probable cause or reasonable suspicion, but rather the court must apply an objective standard). Although not precisely delineated, the minimal level of justification for an investigatory stop has been described as something more than a “mere hunch” based on bare intuition. U.S. v. Arvizu, 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). Although no bright-line or precise definition of “reasonable suspicion” can be found, courts have underscored that the officer must be able to articulate specific facts from which a reasonable person could rationally infer that a crime is being, or is about to be, committed in order to support the officer’s detention of a suspect. Hilton v. State, 961 So.2d 284, 294 (Fla.2007).
An officer need not actually witness any criminal activity in order to support a Terry-stop. Hernandez, 784 So.2d at 1126. As a matter of fact, even conduct consistent with innocent activity can give rise to a reasonable suspicion in support of a Terry-stop when all the circumstances are taken into consideration. Id. (underscoring that innocent, non-criminal, behavior will frequently provide the basis for reasonable suspicion); see also Beahan v. State, 41 So.3d 1000, 1004 (Fla. 1st DCA 2010) (“[T]he officer’s suspicions need not be inconsistent with a hypothesis of innocence. Rather, they need to be based only on rational inferences, from articulable facts, which reasonably suggest criminal activity.”).
Florida courts have emphasized that no single factor is dispositive to establish that an officer’s suspicion leading to a Terry-stop is reasonable. Instead, the circumstances, as they are known to the officer at the time of the investigative stop, are viewed in their totality. Hernandez, 784 So.2d at 1128. Additionally, the officer’s training and experience is taken into consideration to determine whether anything incongruous or unusual reasonably triggered the officer’s suspicion to conduct a stop. Id. at 1126; see also May v. State, 77 So.3d 831, 835 (Fla. 4th DCA 2012) (holding that while some conduct consistent with drug activity may not arouse suspicion in an average citizen, an officer’s training and experience of how drug crimes are committed may provide the officer with a different perspective and should factor into the rubric when determining the reasonableness of the officer’s suspicion); Jenkins v. State, 524 So.2d 1108, 1109 (Fla. 3d DCA 1988) (“A ‘founded’ suspicion is one which has some factual foundation in the circumstances observed by the officer when those circumstances are interpreted in light of the officer’s knowledge.”) (quoting G.J.P. v. State, 469 So.2d 826, 827 (Fla. 2d DCA 1985)).
The following factors may be considered by police officers to arrive at a reasonable suspicion that a crime is being or is about to be committed and to support the investigatory stop or detention of a suspect:
The time; the day of the week; the location; the physical appearance of the suspect; the behavior of the suspect; the appearance and manner of operation *98 of any vehicle involved; anything incongruous or unusual in the situation as interpreted in the light of the officer’s knowledge.
To this list may be added, the factor of flight.
Hernandez, 784 So.2d at 1126 (citations omitted).
In the instant case, although the initial consensual contact between Officer Sanchez and the defendant did not require Officer Sanchez to have a reasonable suspicion, once Officer Sanchez stopped the defendant and asked whether he had any weapons in his possession, the encounter became an investigative stop. Popple, 626 So.2d at 186 (holding that once the officer asked the defendant to exit his vehicle, the encounter became a stop because the defendant was no longer free to leave); State v. Wilson, 566 So.2d 585, 586 (Fla. 2d DCA 1990) (holding that by the time the officer asked the defendant if he could frisk him, the encounter had evolved into a stop). At that point, Officer Sanchez needed to possess a reasonable, articulable, and particularized suspicion of criminal activity in order to justify his stop of the defendant.
We find that the information known to Officer Sanchez and Officer Dunaske at the time they seized the defendant was sufficient to create a reasonable suspicion that criminal activity was taking place. The undisputed facts show that the encounter with the defendant took place (1) at ten o’clock in the evening, (2) in a dark and poorly-lit area, (8) in a high crime neighborhood known for shootings and narcotics. See, e.g., State v. Russell, 659 So.2d 465, 466 n. 1 (Fla. 3d DCA 1995) (holding that the defendant’s presence in a dark alleyway, at six o’clock in the morning, behind a closed business, in an exclusively commercial area, supported the investigative stop, and explaining that knowledge of recent burglaries in an area is a relevant circumstance to be considered in determining the reasonableness of an officer’s suspicion because knowledge of the character of the area is part of an officer’s expertise). Compare Hernandez, 784 So.2d at 1127 (finding reasonable suspicion where the officer observed two vans backed up to each other with their back doors open in a parking lot at three o’clock in the morning because, while this scene may not arouse suspicion during the day, such an arrangement of the vehicles at that time of night was suspicious) and Mitchell v. State, 787 So.2d 224, 229 (Fla. 2d DCA 2001) (finding reasonable suspicion where the incident took place in a high crime area, the officer knew of recent drug sales in the area, and the suspect attempted to flee) with Thornton v. State, 80 So.3d 1141, 1142 (Fla. 4th DCA 2012) (finding no reasonable suspicion where the officer observed a group of ten to fifteen men standing in front of a barbershop in the middle of the afternoon); Daniels v. State, 543 So.2d 363 (Fla. 1st DCA 1989) (finding no reasonable suspicion where the officers saw a group of twenty or thirty people gathered behind a bar mid-day); and Jenkins v. State, 524 So.2d 1108, 1108 (Fla. 3d DCA 1988) (underscoring that an individual’s presence in a high crime area, alone, is not sufficient to support a reasonable suspicion).
In addition to these facts, the men were standing close to a chain link fence separating the field from a house and they appeared to be looking into the house. While this conduct may arguably be consistent with innocent activity, the officers testified that, based on their training and experience, they believed that the men were casing the house in preparation for a burglary. See Hernandez, 784 So.2d at 1126 (noting that innocent behavior frequently provides the basis for a showing of reasonable suspicion). Also, as soon as the *99 men saw the marked police vehicle turn around, the men dispersed and headed away from the officers. While not “headlong flight,” this evasive action by the men certainly contributed to the officers’ reasonable suspicion that criminal activity was being, or was about to be, committed. See U.S. v. Gordon, 231 F.3d 750, 756-58 (11th Cir.2000) (underscoring that the key to flight is not whether it is headlong or fast, but rather whether it is unprovoked, and noting that the suspect’s evasive conduct, which was provoked only by the appearance of a police vehicle and eye contact with the police officer could constitute flight and arouse reasonable suspicion).
Lastly, and importantly, Officer Du-naske observed the defendant manipulating something in his waistband, which, based on his training and experience, he believed was a firearm. We find that these facts are sufficient to establish a reasonable suspicion that the defendant was engaging, or preparing to engage, in some criminal activity including carrying a concealed firearm. Accordingly, the officers’ detention of the defendant was lawful and authorized by Florida law.
B. The Pat-Down was Lawfully Supported by a Concern for Officer Safety
The trial court granted the defendant’s motion to suppress introduction of the firearm into evidence solely based on the trial court’s erroneous finding that the defendant’s detention was not lawful. As a result, the trial court did not extend its analysis to consider whether the officers had reasonable suspicion to conduct a pat-down of the defendant. Because the detention was lawful, we now consider whether the pat-down of the defendant was justified.
Under Florida law, three conditions are necessary to effectuate a lawful pat-down: (1) the suspect’s temporary detainment must be lawful; (2) the officer must have a reasonable suspicion that the suspect is armed; and (3) the pat-down must be strictly limited “only to the extent necessary to disclose, and for the purpose of disclosing,” the weapon. § 901.151(5). Because we find that all three conditions are satisfied, we hold that Officer Sanchez’s pat-down of the defendant was lawful. Accordingly, the firearm discovered during the lawful pat-down was admissible into evidence and the trial court erred in granting the defendant’s motion to suppress. § 901.151(6).
As with an officer’s suspicion to conduct an investigatory stop, the reasonableness of an officer’s suspicion to conduct a pat-down of a suspect is evaluated by the totality of the circumstances when viewed in light of the officer’s training and experience. Enich v. State, 838 So.2d 1216, 1218 (Fla. 3d DCA 2003). Accordingly, those circumstances that we have already addressed in our discussion on the legality of the defendant’s detention must also factor into our consideration of the reasonableness of the officers’ suspicion that the defendant was armed with a dangerous weapon and presented a threat to their safety. Therefore, in addition to the defendant’s gesture of manipulating his waistband and hiking up his pants, the time of day, the poorly-lit conditions, the high-crime nature of the area, the fact that the suspects appeared to be casing the neighboring house and dispersed as soon as they noticed the marked police vehicle also factor into this Court’s analysis of whether the defendant’s pat-down was justified by a reasonable suspicion that he was carrying a concealed weapon.
Officer Dunaske testified that he saw the defendant manipulate his waistband and hike up his pants and that based on his training and experience, his observation of this gesture led Officer Dunaske to *100 believe that the defendant was concealing a weapon. Officer Dunaske explained that this gesture was a known indicator of someone carrying a gun because when a gun is held in a waistband without a holster, the weight of the gun causes it to slip down and the suspect instinctively tends to grab the barrel and push the gun up to prevent it from slipping. We find that, as they were articulated by Officer Dunaske, the circumstances surrounding the incident at issue, particularly the defendant’s gesture towards his waistband, sufficiently supported the officers’ belief that the defendant might be concealing a weapon and that a pat-down was warranted in order to ensure the officers’ safety. See Mackey v. State, 83 So.3d 942, 945-47 (Fla. 3d DCA 2012) (underscoring that an officer’s observation based on his experience and training that a suspect may be carrying a concealed weapon justifies not just a pat-down, but also a search); Wilson, 566 So.2d at 586-87 (finding that defendant’s “body movements and nervous demeanor during the consensual encounter” whereby he “repeatedly reached behind himself, touching the waistband of his pants,” gave the officer reasonable suspicion to frisk the defendant). Consequently, because the firearm discovered on the defendant’s person was the product of a legal search, it was admissible into evidence. § 901.151(6).
Accordingly, we find that the trial court erred in granting the defendant’s motion to suppress introduction of the firearm into evidence, and we therefore reverse and remand with instructions to the trial court to vacate the order of suppression and to enter an order denying the defendant’s motion to suppress.
Reversed and remanded with instructions.

. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

. Section 901.151 (2) provides that:
Whenever any law enforcement officer of this state encounters any person under circumstances which reasonably indicate that such person has committed, is committing, or is about to commit a violation of the criminal laws of this state or the criminal ordinances of any municipality or county, the officer may temporarily detain such *96 person for the purpose of ascertaining the identity of the person temporarily detained and the circumstances surrounding the person’s presence abroad which led the officer to believe that the person had committed, was committing, or was about to commit a criminal offense.

. Section 901.151(6) provides:
(6) No evidence seized by a law enforcement officer in any search under this section shall be admissible against any person in any court of this state or political subdivision thereof unless the search which disclosed its existence was authorized by and conducted in compliance with the provisions of subsections (2)-(5).