DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT
*July Term 2014*

**ALFREDO ARTURO SOTELO GOMEZ,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D11-2976

[November 19, 2014]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Stephen A. Rapp, Judge; L.T. Case No. 2009CF000335AMB.

Valarie Linnen, Atlantic Beach, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Joseph A. Tringali, Assistant Attorney General, West Palm Beach, for appellee.

FORST, J.

Appellant Alfredo Arturo Sotelo Gomez appeals his convictions for first-degree murder and kidnapping. Appellant specifically challenges the denial of his motion to suppress all statements and physical evidence derived from his arrest and the denial of his request for a special jury instruction on the "independent act" defense. As set forth below, we find no error in the trial court's decisions and affirm.

**Background**

Appellant became involved in negotiating a narcotics deal with an undercover police officer after the victim introduced the officer, whose true identity remained unknown to either of them, to Appellant. Appellant eventually told the undercover officer that he did not trust the victim because the victim had been "snitching" on some drug dealers, but Appellant assured the undercover officer not to worry because "we'll get him by tomorrow." Soon thereafter, the victim's lifeless body was found floating in a canal, with multiple stab wounds.

When the undercover officer heard that the victim had been murdered, he contacted the detective in charge of the investigation to tell her what he had heard from Appellant. The detective and the officer arranged for the undercover officer to meet with Appellant regarding the narcotics transaction while the detective had a tactical unit on location for surveillance and to obtain Appellant's identification.

The meeting occurred, but no drugs were exchanged, and so Appellant left. Appellant was approached by a deputy, who was part of the surveillance team, on the street soon after as he was walking from his home nearby. The deputy told Appellant that he was investigating a robbery, which was a ruse, and asked if he had seen anything. Appellant said he had not and then the deputy asked for his identification. After Appellant's identification came back with no outstanding warrants, the deputy asked if he would wait for a detective to come to speak with him about the robbery. Appellant agreed.

The detective arrived and asked Appellant a few questions. She then asked Appellant to come to the Sheriff's headquarters with her to see if he could help with the robbery investigation. Appellant agreed and rode, unrestrained, to the headquarters with another officer. At this point, the officers had not returned Appellant's identification.

At the headquarters, Appellant was kept unrestrained and agreed to have his fingerprints, his DNA, and some pictures taken. The detective read Appellant his *Miranda*[1] warnings, and then she and the undercover officer asked Appellant about the victim's murder. Appellant eventually confessed to his involvement in the murder. He explained that he and a group of drug dealers wanted to shut up the victim and "make him deaf and mute" because he had "ratted them out." The group devised a plan to have a female accomplice bring the victim to a certain bar and then come outside when the group arrived. When the group arrived at the bar, the victim came outside with the woman and then got in the car with Appellant. The group drove to a canal where Appellant led the victim out of the car, holding the victim's hands behind his back. Another individual, nicknamed "Yogi" or "Yoqui," then came up from behind Appellant and slashed the victim's throat and stabbed him while Appellant held him. Appellant and another accomplice then dragged the victim's body to the canal and threw him in. This interview was recorded.

Appellant moved to suppress the statements to the officers and the

---

[1] *Miranda v. Arizona,* 384 U.S. 436 (1966).

physical evidence obtained after his arrest, arguing that the officers lacked probable cause to arrest him. The trial court denied the motion, finding that, although the State argued that Appellant was never arrested but voluntarily went with the officers, there was a de facto arrest of Appellant that was based on probable cause. The case proceed to trial, and Appellant was convicted of first-degree murder and kidnapping.

## Standard of Review

With a motion to suppress, a trial court's factual findings are reviewed for competent, substantial evidence and mixed questions of law and fact are reviewed de novo. *R.J.C. v. State*, 84 So. 3d 1250, 1254 (Fla. 4th DCA 2012). The trial court's ruling comes to this court "clothed with a presumption of correctness and the court must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court's ruling." *Id.* (quoting *Terry v. State*, 668 So. 2d 954, 958 (Fla. 1996)).

## Denial of the Motion to Suppress

We recognize that even a de facto arrest, where the police do not intend to officially arrest a defendant but the circumstances amount to the defendant not being free to leave the encounter, requires probable cause. *See M.J. v. State*, 121 So. 3d 1151, 1154-56 (Fla. 4th DCA 2013). "Probable cause to arrest or search exists when the totality of the facts and circumstances within an officer's knowledge sufficiently warrant a reasonable person to believe that, more likely than not a crime has been committed." *Bethel v. State*, 93 So. 3d 410, 413 (Fla. 4th DCA 2012) (quoting *State v. Blaylock*, 76 So. 3d 13, 14 (Fla. 4th DCA 2011)). This is a low standard that does not require absolute certainty about criminal activity. *Blaylock*, 76 So. 3d at 15. Additionally, "[u]nder the [fellow officer] rule, one officer may rely on the knowledge and information possessed by another officer to establish probable cause for an arrest for a felony . . . ." *State v. Bowers*, 87 So. 3d 704, 707 (Fla. 2012) (quoting *Bowers v. State*, 23 So. 3d 767, 770 (Fla. 2d DCA 2009)).

We hold that the instant facts, viewed in the light most favorable to sustaining the trial court's ruling, support the conclusion that (1) the officers did conduct a de facto arrest of Appellant, where the failure to return his identification caused Appellant to reasonably believe he was not free to leave, and (2) the arrest was based on probable cause. Appellant's argument on appeal is that the police lacked probable cause to arrest him because the undercover agent testified, "He said that he was going to take care of him by tomorrow, meaning, like many things. I [didn't] know that

3

[the murder of the victim] was what's going to happen." As such, Appellant maintains, this statement was too ambiguous, "standing alone," to lead a prudent person to believe that Appellant committed any offense.

The flaw with Appellant's challenges is that the undercover officer's report was one piece of the puzzle providing the police with probable cause to arrest and question Appellant. At the time of the arrest, the officers collectively knew that Appellant was negotiating a narcotics transaction with an undercover officer after being introduced to the officer by the victim; Appellant had just come from a meeting about that transaction; Appellant had a motive to harm the victim, as he had told the undercover officer (whom he did not know was a law enforcement agent) that he believed the victim was "a snitch"; he had expressed an intent to "deal with" the victim (he told the officer that the victim "would be taken care of"); and there was evidence of murder with respect to the person who Appellant had declared would be "taken care of," as the police recovered the victim's body from the canal shortly after that statement was made. This information warranted a reasonable person to believe that, more likely than not, Appellant was involved in the victim's murder. We therefore affirm the trial court's ruling on the issue of probable cause.

### The Jury Instruction on the Independent Act Defense

Appellant's second challenge on appeal relates to his request for a jury instruction on the independent act defense. We review the trial court's refusal of a requested jury instruction for abuse of discretion. *McClover v. State*, 125 So. 3d 926, 927 (Fla. 4th DCA 2013). "[T]he trial judge's discretion is fairly narrow because a criminal defendant is entitled, by law, to have the jury instructed on his theory of defense if there is *any* evidence to support his theory and the theory is recognized under Florida law." *Id.* (quoting *Palmore v. State*, 838 So. 2d 1222, 1223 (Fla. 1st DCA 2003) (emphasis in original)).

"The independent act doctrine arises when one co-felon, who previously participated in a common plan, does not participate in acts committed by his co-felon, which fall outside the common design of the original collaboration." *Lopez v. State*, 97 So. 3d 301, 304 (Fla. 4th DCA 2012); *see also* Fla. Std. Jury Instr. (Crim.) 3.6(*l*). "[Where, however,] the defendant was a willing participant in the underlying felony and the murder resulted from forces that they set in motion, the independent act instruction is inappropriate." *Johnson v. State*, 36 So. 3d 170, 172 (Fla. 3d DCA 2010).

In the present case, the trial court did not abuse its discretion in

4

denying the request for an instruction on the independent act defense where the evidence does not support giving the instruction. Appellant and the group of drug dealers clearly devised a plan to intimidate and/or harm the victim. One member of the group testified that the plan was to make the victim "permanently deaf and blind." The same witness testified that they all saw "Yogi" with the murder weapon while they were making the plan. Although Appellant may not have intended for the victim to be so brutally murdered or even murdered at all, Appellant willingly participated in the crimes by preventing the victim from running away and holding his hands behind his back, which set forces in motion leading to the murder. *See id.* Even after the victim's throat was slashed, Appellant assisted in throwing the body in the canal. Furthermore, the harming and killing of the victim were "a reasonably foreseeable consequence of the common design" to make the victim "permanently deaf and blind," as contemplated by Appellant. *See* Fla. Std. Jury Instr. (Crim.) 3.6(*l*).

## Conclusion

Because we find no error in the trial court's decision to deny the motion to suppress and deny the requested jury instruction, we affirm.

*Affirmed.*

DAMOORGIAN, C.J., and CIKLIN, J., concur.

* * *

***Not final until disposition of timely filed motion for rehearing.***