NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT


MARQUESE D. GOODMAN,                    )
                                        )
          Appellant,                    )
                                        )
v.                                      )          Case No. 2D18-1632
                                        )
STATE OF FLORIDA,                       )
                                        )
          Appellee.                     )
                                        )
_____ )

Opinion filed September 27, 2019.

Appeal from the Circuit Court for
Hillsborough County; Mark D. Kiser,
Judge.

Howard L. Dimmig, II, Public Defender,
and Daniel Muller, Assistant Public
Defender, Bartow, for Appellant.

Ashley Moody, Attorney General,
Tallahassee, and Brandon R. Christian,
Assistant Attorney General, Tampa; and
Bilal Ahmed Faruqui, Assistant Attorney
General, Tampa (substituted as counsel
of record), for Appellee.

ATKINSON, Judge.

Marquese Goodman appeals the judgment and sentences entered against him on four counts of drug possession and one count of resisting without violence.[1]  The State failed to establish that the officer had probable cause to arrest Mr. Goodman for failing to comply with the officer's initial, nonverbal request to stop and failed to establish reasonable suspicion that Mr. Goodman was armed and dangerous to justify the subsequent frisk.  As such, we must reverse the trial court's denial of Mr. Goodman's motion to suppress the contents of a pill bottle recovered during the encounter.

I.

On the night of October 8, 2017, Marquese Goodman, clothed in a t-shirt and athletic shorts, was riding his bicycle in the middle of the street.  A law enforcement officer was outside his vehicle finishing another stop when he observed that Mr. Goodman's bicycle did not have a light.[2]  Intending to stop Mr. Goodman for that traffic infraction, the officer entered his patrol vehicle, followed Mr. Goodman, and activated his lights.  At that point, Mr. Goodman looked back but continued riding.  The officer then used his siren, giving it a yelp, in an effort to get Mr. Goodman to stop.  The officer admitted that there were other people in the area behind him and that he did not call out to Mr. Goodman.  However, he believed that Mr. Goodman should have known that the officer was directing him to stop using his lights and siren because Mr. Goodman

---

[1]Mr. Goodman pled guilty to these charges but reserved the right to appeal the denial of his dispositive motion to suppress.

[2]See § 316.2065(7), Fla. Stat. (2017) (requiring that each bicycle used between sunset and sunrise have a light visible from at least 500 feet).

stopped, jumped off of his bicycle, and began walking away from the officer after first looking at the officer and "acknowledging that [his] lights were activated for a traffic stop."

At that point, the officer exited his patrol vehicle, began running after Mr. Goodman and, when he was approximately twenty-five feet away, ordered him to stop. Mr. Goodman immediately complied, and then he began walking towards the officer with his bicycle. It is from this point that the officer's body camera video begins and depicts the rest of the encounter.

As the officer approached, Mr. Goodman parked his bicycle in between himself and the officer. Without being instructed to do so, Mr. Goodman walked a few feet to the curb and sat down. This forced the officer to walk around the bicycle to approach Mr. Goodman, who was seated on the curb, leaning forward with his elbows resting on his knees and his hands positioned in front of his body.

To the officer, Mr. Goodman appeared very nervous. Understandably, the officer attested to being nervous himself, in light of Mr. Goodman's initial failure to stop, his unprompted decision to sit down on the curb, and the fact that Mr. Goodman was "hunching over and leaning onto his right side." The officer believed that Mr. Goodman was "trying to conceal something," given the "way he was sitting" and his abnormal demeanor. The officer described Mr. Goodman as "using his right arm with his right leg and ha[ving] it extended to a point where he was almost resting and trying to avoid me seeing the right side of his body."

The officer asked Mr. Goodman if he had any identification on him, and Mr. Goodman responded in the negative. He then asked Mr. Goodman if he had

anything on him with his name on it.  Mr. Goodman replied that he did and began rummaging through his pocket to comply with the officer's request.  Before he could do so, the officer abruptly asked Mr. Goodman to stand up, at which point he began to frisk Mr. Goodman.  The officer stated that he decided to conduct this pat-down for officer safety as another officer was approaching because Mr. Goodman was acting as if "he was hiding something which could possibly could be a weapon on his right side."

The officer began the pat-down by focusing on that right side.  He immediately felt a large, hard object in Mr. Goodman's right pocket, which the officer recognized as a pill bottle.  At that point, Mr. Goodman "braced and tensed" then attempted to flee but made it only six or eight steps before being taken down by the two officers, who handcuffed him and placed him under arrest.  Officers located a prescription bottle approximately two or three feet away from Mr. Goodman.  The bottle contained marijuana, pills imprinted "MDMA Ecstasy," eight white rocks appearing to be cocaine, and a few Adderall pills.

The trial court denied Mr. Goodman's motion to suppress.  Acknowledging that it was not as clear on the video as it was from the officer's testimony, the trial court concluded that there was reasonable suspicion that Mr. Goodman was armed in light of the officer's description of Mr. Goodman's actions and the way he was hunching over.[3]

_____

[3]The trial court found that there was "not a true inconsistenc[y] between the video and the officer's testimony" (the latter of which did not include a description of Goodman's hands).  However, we conduct an independent review of the recording as part of our assessment of the totality of the circumstances.  See State v. Thompson, 193 So. 3d 916, 919 (Fla. 2d DCA 2016) ("An appellate court may independently review the audio recording of an interview to assess whether competent, substantial evidence supports the trial court's findings."  (citing Cuervo v. State, 967 So. 2d 155, 160 (Fla. 2007))); see also Almeida v. State, 737 So. 2d 520, 524 n.9 (Fla. 1999) ("The trial court

The court reasoned that because Mr. Goodman attempted to flee from a lawful pat-down, the arrest was justified and the search of the pill bottle was incident to that lawful arrest.

A determination as to whether a reasonable suspicion exists under a given set of facts is a question of law that is reviewed de novo. Beahan v. State, 41 So. 3d 1000, 1002 (Fla. 1st DCA 2010). The trial court's factual findings, however, are presumed correct and reviewed to determine if they are supported by competent, substantial evidence. See Dawson v. State, 58 So. 3d 419, 421 (Fla. 2d DCA 2011).

II.

Although not argued in the trial court, the State contends on appeal that the search of Mr. Goodman was valid because the officer had probable cause to arrest him for resisting an officer without violence before the pat-down occurred. However, the State failed to adduce sufficient evidence at the suppression hearing to permit affirmance on this basis.[4]

Law enforcement officers "must have probable cause to arrest and search a person without a warrant." State v. Zachery, 255 So. 3d 957, 961 (Fla. 2d DCA 2018)

---

had no special vantage point in reviewing this tape."); Taylor v. State, 276 So. 3d 98, 98 (Fla. 2d DCA 2019).

[4]Under the tipsy coachman doctrine, an appellate court can "affirm a trial court that 'reaches the right result, but for the wrong reasons' so long as 'there is any basis which would support the judgment in the record.' " Robertson v. State, 829 So. 2d 901, 906 (Fla. 2002) (quoting Dade Cty. Sch. Bd. v. Radio Station WQBA, 731 So. 2d 638, 644 (Fla. 1999)). The State bore the burden of establishing that the warrantless search of Mr. Goodman was incident to a lawful arrest. See Gnann v. State, 662 So. 2d 406, 408 (Fla. 2d DCA 1995) ("Because the officers failed to obtain a warrant and the state failed to prove that Gnann's arrest and the subsequent search were lawful, the motion to suppress should have been granted.").

- 5 -

(citing Gomez v. State, 155 So. 3d 1184, 1187 (Fla. 4th DCA 2014)).  Probable cause to justify an arrest requires facts and circumstances that "allow a reasonable officer to conclude that an offense has been committed."  Mathis v. Coats, 24 So. 3d 1284, 1288 (Fla. 2d DCA 2010).  The crime of resisting an officer without violence occurs when a suspect (1) knowingly (2) resists, obstructs, or opposes a law enforcement officer (3) who is in the lawful execution of any legal duty.  See § 843.02, Fla. Stat. (2017); Brown v. State, 199 So. 3d 1010, 1012 (Fla. 4th DCA 2016) ("[T]he state's evidence was insufficient to prove that the defendant knew of the police's intent to detain him.").

Generally, "flight, standing alone, is insufficient to form the basis of a resisting without violence charge."  C.E.L. v. State, 24 So. 3d 1181, 1186 (Fla. 2009).  "[A]n individual who flees must know of the officer's intent to detain him."  Id.; accord McClain v. State, 202 So. 3d 140, 141, 143 (Fla. 2d DCA 2016) (concluding that the defendant's conviction could not stand where he ran into his grandmother's duplex before the officer could order him to stop); S.B. v. State, 31 So. 3d 968, 970 (Fla. 4th DCA 2010) ("[A]lthough the evidence may reflect that S.B. was aware that he had caught the officers' attention when he began to flee, it does not prove that he had knowledge that the officers intended to detain him.").

Where there is a command to stop, there must be evidence that the individual actually heard it (or perceived it, if it was nonverbal) and that the individual understood that the command was directed at him.  Compare O.B. v. State, 36 So. 3d 784, 788 (Fla. 3d DCA 2010) ("[T]here is no evidence that O.B. heard any order to stop; in fact, he testified that when he 'took off running,' he did not hear the officers issue a command, and he was unaware whether an officer was after him in particular."), with

Montanez v. City of Orlando, 678 Fed. Appx. 905, 909 (11th Cir. 2017) (finding that an officer had probable cause to arrest the defendant for resisting an officer without violence where, after the officer commanded the two bicyclists to stop, one complied while the other continued to peddle away, making it reasonable for the officer to conclude that the defendant heard the command but deliberately refused to obey), and United States v. Merricks, 572 Fed. Appx. 753, 757 (11th Cir. 2014) (finding probable cause to arrest for resisting or opposing the police without violence where defendant had pedaled faster after realizing officers were following him with police lights activated before walking away after failing to heed the officers' verbal commands to stop).

Here, there is insufficient evidence to justify the arrest of Mr. Goodman for intentionally fleeing from the officer before the pat-down. The officer's initial command to stop—the activation of lights and the yelp of a siren—was nonverbal. Knowledge of an officer's intention to detain a pedestrian or bicyclist can be established by nonverbal communication under the appropriate facts. However, in this case the defendant actually obeyed the subsequent verbal command, strongly suggesting that the preceding, ambiguous law enforcement activity could have been perceived by a reasonable cyclist as unrelated to himself. Without testimony about how closely the officer followed behind Mr. Goodman with his lights activated or for how long, we cannot surmise whether Mr. Goodman knew that the officer was directing him to stop. Cf. State v. Kirer, 120 So. 3d 60, 61, 64 (Fla. 4th DCA 2013) (finding probable cause that the driver fled or eluded the deputy by making five turns after the deputy followed two car lengths behind the driver for almost five minutes with lights and siren activated and ordered the driver to stop multiple times over his vehicle's P.A. system); Henderson v.

- 7 -

<u>State</u>, 88 So. 3d 1060, 1063 (Fla. 1st DCA 2012) ("[W]hen the officers attempted to pull appellant over with lights and sirens activated, appellant continued to drive for nearly two miles, providing probable cause to stop him for violating section 316.1935(2).").

Nor can we conclude based on Mr. Goodman's actions that he knowingly refused to stop. It is not enough to establish that an individual perceived an officer's nonverbal cue if there is nothing to support that the individual understood it as a command for him to stop. The officer here testified that Mr. Goodman looked back after the lights were on and continued riding before getting off his bicycle and walking it away from the officer after the yelp from the siren. Although this might suggest that Mr. Goodman knew the officer was attempting to communicate with someone, there is no indication, especially based on his subsequent actions, that he understood that the officer was ordering him to stop. Mr. Goodman did not increase his speed or engage in any evasive maneuvers. And once the officer verbally directed Mr. Goodman to stop, he immediately complied. Cf. <u>Merricks</u>, 572 Fed. Appx. at 757 (concluding that officers had probable cause to arrest the defendant after he began pedaling faster once the patrol vehicle's lights were activated and he failed to respond to the officers' verbal commands).

Even though the officer may have harbored an intuition that Mr. Goodman was aware that the officer was commanding him to stop, that subjective belief alone cannot satisfy the requirement of an objective assessment of whether he had probable cause to arrest Mr. Goodman for resisting without violence. See <u>Illinois v. Gates</u>, 462 U.S. 213, 272 (1983) ("[W]e have repeatedly held that the unsupported assertion or belief of an officer does not satisfy the probable cause requirement."); cf. <u>G.M. v.</u>

- 8 -

State, 19 So. 3d 973, 980 n.5 (Fla. 2009) ("Although the officers may have activated their lights to indicate that they were police officers, the United States Supreme Court has held that the subjective intent of police officers is 'relevant to an assessment of the Fourth Amendment implications of police conduct <u>only to the extent that that intent has been conveyed to the person confronted.</u>' " (quoting <u>Michigan v. Chesternut</u>, 486 U.S. 567, 575 n.7 (1988))).

Because the officer lacked probable cause to arrest Mr. Goodman for resisting without violence before the pat-down occurred, the search incident to Mr. Goodman's subsequent arrest cannot be affirmed under the tipsy coachman doctrine.

III.

Mr. Goodman contends that the officer who lawfully detained him for the traffic infraction of failing to have a light on his bicycle subsequently conducted an illegal <u>Terry</u>[5] frisk. He claims that the officer's stated bases for conducting the pat-down did not amount to reasonable suspicion that he was armed and dangerous.

A legal predicate for the initial stop does not, without more, justify a pat-down for weapons. See <u>State v. Herron</u>, 68 So. 3d 330, 331 (Fla. 3d DCA 2011). Rather, "the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." <u>Arizona v. Johnson</u>, 555 U.S. 323, 327 (2009); <u>accord</u> <u>State v. Callaway</u>, 582 So. 2d 745, 746 (Fla. 2d DCA 1991) ("The standard for evaluating the reasonableness of a frisk is 'whether the officer is justified in believing the defendant is armed and dangerous.' " (quoting <u>State v. Webb</u>, 398 So. 2d 820, 821 (Fla. 1981))). The reasonableness of the officer's suspicion depends upon the totality of

---

[5]<u>Terry v. Ohio</u>, 392 U.S. 1 (1968).

the circumstances, including the officer's training and experience.  See State v. Cruse, 121 So. 3d 91, 99 (Fla. 3d DCA 2013) (citing Enich v. State, 838 So. 2d 1216, 1218 (Fla. 3d DCA 2003)).

Here, the officer testified that he conducted the pat-down of Mr. Goodman because (1) he attempted to avoid the initial stop, (2) he appeared nervous, (3) he placed his bicycle between himself and the officer, (4) he sat down on the curb without being instructed to do so, and (5) while sitting there, "he hunched over then leaned toward his right side as if to conceal something."  Florida courts have found pat-down searches following traffic stops unjustified under similar facts.  See, e.g., Dawson, 58 So. 3d at 422 (refusing to comply with requests to keep hands out of pockets); Coleman v. State, 723 So. 2d 387, 387–88 (Fla. 2d DCA 1999) (acting nervous and holding hand over pants pocket); Smith v. State, 735 So. 2d 570, 572 (Fla. 2d DCA 1999) (acting nervous and perspiring); Griffin v. State, 150 So. 3d 288, 291–92 (Fla. 1st DCA 2014) (standing with hands in pockets in high crime area); Herron, 68 So. 3d at 331 (acting nervous and fidgety and looking out of the window for "an avenue of escape"); C.D. v. State, 82 So. 3d 1037, 1039–40 (Fla. 4th DCA 2011) (walking away from officer then moving hands towards pockets); D.B.P. v. State, 31 So. 3d 883, 887 (Fla. 5th DCA 2010) (reaching into pocket repeatedly); State v. Barnes, 979 So. 2d 991, 993 (Fla. 4th DCA 2008) (appearing nervous and attempting to place hands in pockets as officer approached); Ray v. State, 849 So. 2d 1222, 1225 (Fla. 4th DCA 2003) (expressing reluctance to remove hands from pockets).

Where, as here, there are multiple bases for the pat-down, they must be considered cumulatively in determining whether there is reasonable suspicion to believe

- 10 -

an individual is armed and dangerous. See United States v. Bunkley, 281 Fed. Appx. 886, 889 (11th Cir. 2008); cf. Cresswell v. State, 564 So. 2d 480, 483 (Fla. 1990) ("Although these facts viewed individually could be consistent with legal behavior, when viewed together by a trained law enforcement officer such facts, 'meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion.' " (quoting United States v. Cortez, 449 U.S. 411, 419 (1981))).

After being detained for a traffic stop, Mr. Goodman immediately placed the bicycle between himself and the officer, forcing the officer to walk around it. Mr. Goodman walked away from the officer and sat on the curb without being prompted to do so. This made the officer "immediately nervous," especially since "he was hunching over and leaning onto his right side when he was sitting down." This suggested to the officer, based on his experience, that Mr. Goodman was attempting to conceal something on his right side, which was possibly a weapon. However, there are no specific facts indicating that what Mr. Goodman might have been attempting to conceal was a weapon, as opposed to some other type of contraband. See Moore v. State, 874 So. 2d 42, 43 (Fla. 2d DCA 2004) (concluding that the officer's mere belief that all of the passengers were armed did not justify the pat-downs where that belief was "not grounded in any factual support").

Nor did Mr. Goodman behave in a manner that would otherwise indicate that he was dangerous. To pat down an individual detained following a noncriminal traffic infraction, the officer must possess some information indicating that the detainee poses a threat to the officer's safety or to the safety of others. Compare State v. Jones,

- 11 -

203 So. 3d 972, 973–74 (Fla. 2d DCA 2016) (holding that neither the body position of Mr. Jones nor his effort to retrieve his identification from his bookbag created a reasonable suspicion that he possessed a weapon or "otherwise posed a reasonable concern for officer safety"), with Cole v. State, 190 So. 3d 185, 187, 189 (Fla. 3d DCA 2016) (concluding that an officer had reasonable suspicion to believe a driver posed a threat to the officer's safety where he "was sweating, bouncing his legs up and down, and looked afraid" and was tightly gripping a pen with his fists clenched), June v. State, 131 So. 3d 2, 7–8 (Fla. 1st DCA 2012) (holding that the officer reasonably suspected that the bicyclist was "armed and potentially dangerous" where he acted nervous after admitting to having a pocketknife, and he continuously reached for the pocket containing that knife), and State v. Louis, 571 So. 2d 1358, 1358–59 (Fla. 4th DCA 1990) (noting that the officer reasonably feared for his safety where the driver walked around the vehicle erratically with his hands in the pockets of his bulky jacket).

The State did not meet its burden of adducing facts sufficient to conclude that Mr. Goodman was armed and dangerous. Mr. Goodman may have ostensibly failed to heed the officer's initial nonverbal instructions, but after the audible order to stop, he immediately parked his bike and complied. Mr. Goodman walked several feet and sat down on the curb in a hunched-over position without being instructed to do so, but his decision to move away from his bicycle and to sit down, although unsolicited, arguably made him less of a flight risk. With his bicycle, he would have been more likely to successfully elude the officer who was now on foot; having separated himself from his previous means of locomotion, it would be difficult for him to stand up, retrieve it, then peddle away without being apprehended.

- 12 -

Mr. Goodman also answered all of the officer's questions, and it is clear from the video that he held his hands away from his body so that the officer could see them throughout the encounter. Moreover, he did not make any furtive movements or gestures, and it was only after the officer asked Mr. Goodman for something with which to identify himself that he placed his hand anywhere near his pocket. Cf. State v. Raines, 576 So. 2d 896, 898 (Fla. 2d DCA 1991) (upholding the pat-down where Mr. Raines "quickly moved his hands under the driver's seat in an attempt to conceal something"); State v. Wilson, 566 So. 2d 585, 586 (Fla. 2d DCA 1990) (concluding there was reasonable suspicion for the pat-down after "the defendant repeatedly reached behind himself, touching the waistband of his pants"); Cruse, 121 So. 3d at 100 (finding reasonable suspicion where the officer saw Mr. Cruse manipulate his waistband and "hike up" his pants which "was a known indicator of someone carrying a gun" without a holster).

It is true that the sum of individual facts which may not in isolation justify a Terry frisk might, in some cases, be greater than those parts; however, this is not such a case. Here, the totality of the circumstances was insufficient to justify the pat-down of Mr. Goodman. Rather than acting aggressively, behaving erratically, or otherwise conducting himself in a threatening manner, Mr. Goodman was compliant and assumed a position that made him less of a threat to the officers.

While we acknowledge and appreciate that law enforcement officers contend with perilous, often life-or-death scenarios on a regular basis and develop instincts and intuition not common to those who do not perform the dangerous work they do, controlling law places the burden on the State to establish an objective

justification for a warrantless pat-down search.  Because there were no articulable facts to support the officer's belief that Mr. Goodman was armed and dangerous, the trial court erred when it concluded that the pat-down was lawful.

IV.

Whether the trial court properly denied the motion to suppress also turns on the application of the exclusionary rule, which bars "from trial the physical, tangible materials obtained either during or as a direct result of an unlawful invasion."  See Wong Sun v. United States, 371 U.S. 471, 486 (1963).  The rule is inapplicable if "the evidence would have inevitably been discovered in the course of a legitimate investigation" or "sufficient attenuation existed between the challenged evidence and the illegal conduct."  Moody v. State, 842 So. 2d 754, 759 (Fla. 2003).

The officers would not have inevitably discovered the pill bottle during the course of their traffic investigation.  See Moody, 842 So. 2d at 759 (finding the inevitable discovery doctrine inapplicable where the police were not already in possession of facts that would have led to the evidence notwithstanding the police misconduct).  The only information that the officers had about Mr. Goodman was that he was riding his bicycle at night without a light.  Because they could not have arrested him for this noncriminal traffic infraction, they could not have discovered the pill bottle while conducting a search incident to arrest.

And there was no attenuation between the illegal Terry frisk and the seizure of the narcotics.  The pill bottle fell out of Mr. Goodman's pocket at some point during his attempt to flee from the illegal pat-down and the almost immediate tackle by the officers, who recovered the bottle on the ground a few feet away from where they

had apprehended him.  See State v. Dickey, 203 So. 3d 958, 964 (Fla. 1st DCA 2016) ("[T]he contraband that was ultimately discovered on Appellee's person was found as a direct result of the deputy's exploitation of his illegal actions.").

V.

For the foregoing reasons, the trial court's order denying Mr. Goodman's motion to suppress is reversed and remanded with directions for discharge.  See Beezley v. State, 863 So. 2d 386, 388 (Fla. 2d DCA 2003) ("Because the motion was dispositive, we reverse and remand for Beezley's discharge on all three counts.").

Reversed and remanded with directions.

SILBERMAN and LaROSE, JJ., Concur.